**FILED**
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.

★ SEP 1 0 2009 ★

**BROOKLYN OFFICE**

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------x
JOHN PETRONE,

                 Plaintiff,

       – against –

HAMPTON BAYS UNION FREE SCHOOL
DISTRICT, J. BRUCE McKENNA, personally,
SAM McALEESE, personally, and LORETTA
CAHILL, personally,

                 Defendants.
------------------------------------------------------------x

**MEMORANDUM and ORDER**

03-CV-4359 (SLT) (ARL)

TOWNES, United States District Judge:

       Plaintiff John Petrone, a secondary school teacher, brings this action against his former

employer, the Hampton Bays Union Free School District ("HBUFSD" or "District"), alleging

that the District violated the Americans with Disabilities Act, Section 504 of the Rehabilitation

Act of 1973, and state law by failing to provide him with a reasonable accommodation for, and

forcing him to resign because of, his mental illness. Defendants now move for summary

judgment and plaintiff cross-moves to amend his pleading. For the reasons stated below,

plaintiff's motion to amend his pleading is granted, and defendants' motion for summary

judgment is deemed temporarily withdrawn until plaintiff has filed his amended pleading and

defendants have been afforded an opportunity to determine whether they wish to amend their

motion for summary judgment in any respect.

## *BACKGROUND*

       In 1999, plaintiff graduated from Southampton College-Long Island University with a

Bachelors of Arts degree in history and political science. November 4, 2002, Deposition of John

Petrone ("Petrone Dep.") (attached as Exhibit C to the Declaration of Adam I. Kleinberg in

Support of Motion for Summary Judgment) at 5; Affidavit of John Petrone, dated June 22, 2006

("Petrone Aff.") at ¶ 2. Thereafter, plaintiff enrolled in a graduate program at Southampton

College, seeking to become certified as a public-school teacher in the State of New York. Sometime during the two years he spent in graduate school, plaintiff noticed that he became "uptight" on occasions in which he had to speak in public. Petrone Dep. at 24. After he mentioned the problem during a routine physical, his physician referred him to Dr. Peter Gerkin, who diagnosed plaintiff with mild panic disorder and prescribed Paxil, an antidepressant used to treat anxiety disorders. *Id.* at 22, 24-25; *see* http://www.drugs.com/paxil.html.

From January 2001 through May 2001, during his final semester of graduate school, plaintiff worked as a student teacher at Hampton Bays Secondary School, one of two schools operated by defendant HBUFSD. Plaintiff's Counter-Statement of Material Facts Pursuant to Local Rule 56.1 ("Pl. 56.1 Statement") at ¶ 1; Defendants' Statement of Undisputed Material Facts Pursuant to Local Rule 56.1 ("Def. 56.1 Statement") at ¶ 1. During that time, plaintiff was supervised by Fran Stefanek, a "master teacher" who served as "[C]oordinator of the Social Science Division" of the high school and secondary school. Petrone Dep. at 112-13. According to plaintiff, he received favorable evaluations from Stefanek, who subsequently "wrote a letter for [him] to the [D]istrict." *Id.* at 113.

During his tenure as a student teacher, plaintiff applied for a position as a social studies teacher at Hampton Bays Secondary School. In early May 2001, plaintiff was offered, and accepted, the job for the 2001-02 school year. Pl. 56.1 Statement at ¶ 2; Def. 56.1 Statement at ¶ 2. Sometime between May 2001 and the time he started teaching in September 2001, plaintiff stopped taking Paxil. Pl. 56.1 Statement at ¶ 9; Def. 56.1 Statement at ¶ 9; Petrone Aff. at ¶ 9. Plaintiff offers two explanations for his decision to discontinue the medication. First, he claims that the anxiety he felt prior to speaking in public "significantly diminished" as he gained experience teaching classes. Petrone Aff. at ¶ 10. Second, plaintiff states that the hospital at

2

which Dr. Gerkin worked did not have evening hours, and that his job prevented him from visiting the hospital during its hours of operation. Pl. 56.1 Statement at ¶ 9; Def. 56.1 Statement at ¶ 9; Petrone Aff. at ¶ 9.

Plaintiff found his first semester as a teacher "very stressful." Pl. 56.1 Statement at ¶ 10; Def. 56.1 Statement at ¶ 10. "In or about October, 2001, [he] began to feel extremely anxious and tense on a regular basis for no discernable reason." Petrone Aff. at ¶ 11. Thereafter, he began to develop insomnia. Whereas he had been able to sleep 7 or 8 hours a night prior to October 2001, he was sleeping only about 5 hours a night by early October, only 3 to 4 hours in November, and 2 to 3 hours a night in December 2001. *Id.* at ¶¶ 15-18.

Sometime prior to Christmas break, plaintiff also began to experience muscle tremors in his biceps and fingers. December 23, 2004, Deposition of John Petrone ("2d Petrone Dep.") (attached as Exhibit D to the Kleinberg Dec.) at 88-89. Plaintiff does not recall experiencing the tremors during the school day, but thinks that he may have "experienced facial flushing where [he] would just turn bright red" on a couple of occasions. *Id.* at 90. Despite these problems and his insomnia, plaintiff took only three sick days during his first three months of teaching. *See* Declaration of Adam I. Kleinberg in Support of Motion for Summary Judgment ("Kleinberg Dec."), Ex. H. According to plaintiff, he took those days off due to pharyngitis, and not due to his mental state. Petrone Dep. at 34.

Plaintiff visited his mother and sisters in California over the Christmas break, but "noticed that [he] couldn't relax." 2d Petrone Dep. at 93. When he returned to school in January 2002, he "started to notice that things were progressively getting worse." *Id.* at 92. Plaintiff claims that he was sleeping only one hour a night by that point and was experiencing panic attacks in his sleep. *Id.*; Petrone Aff. at ¶ 19. According to plaintiff:

3

> I was waking up where I couldn't breathe, or I would be laying
> there and all of a sudden feel like my throat would just close off ....

2d Petrone Dep. at 92. Plaintiff recalls "gasping for air" and sweating, and states that his muscle tremors were beginning to increase. *Id.*

Plaintiff managed to work throughout the first week of January 2002. Kleinberg Dec., Ex. H; 2d Petrone Dep. at 95. However, on the night of Sunday, January 6, 2002, the symptoms became "extreme." 2d Petrone Dep. at 95. At his December 2004 deposition, plaintiff recalled:

> Sleep was virtually impossible. I was just constantly anxious for no
> specific reason, the muscle tremors were continuing, sweating,
> flushing, and it was a combination of things.
>           *       *       *
> When the panic attacks would kick in it felt like somebody was
> squeezing your throat, not very pleasant. *Id.* at 96.

Plaintiff also testified that he had developed an "inability to concentrate for long periods of time." *Id.* As a result, tasks like correcting homework, which once took "a very short period of time," were taking "a good part of the night." *Id.* at 96-97.

Plaintiff called in sick on Monday, January 7, 2002, but worked the following day. Pl. 56.1 Statement at ¶¶ 15, 17; Def. 56.1 Statement at ¶ 15, 17. However, by the evening of January 8, plaintiff had "gone through four or five days straight of insomnia, ... involuntary muscle tremors, [and] things like that." Petrone Dep. at 39. That evening, he called a hotline operated by his health insurance company, and made an appointment to see Dr. William S. Packard, a psychiatrist, the following day. *Id.*; 2d Petrone Aff. at 95, 97.[1]

---

[1] Plaintiff's deposition testimony is inconsistent with respect to the dates on which he called his insurer and visited Dr. Packard. At his November 2002 deposition, plaintiff testified the he called his insurer on January 8. Petrone Dep. at 39. However, at a deposition over two years later, plaintiff, while expressing uncertainty about the dates, said he thought he had called his insurer on January 6, and seen the psychiatrist on January 7. 2d Petrone Dep. at 97. Dr. Packard's records and plaintiff's school attendance records suggest that his November 2002 testimony was correct.

On January 9, 2002, plaintiff paid his first visit to Dr. Packard. According to Dr. Packard's notes, plaintiff told the doctor that he had been experiencing "severe anxiety and stress" for four months. Deposition of Dr. William S. Packard ("Packard Dep.") (attached as Exhibit F to Kleinberg Dec.) at 6. Although plaintiff stated that he had broken up with a longtime girlfriend in October 2001, *id.* at 8-9, plaintiff spoke primarily of school in describing the source of his anxiety. Plaintiff stated that he found teaching "very stressful," that he had experienced "anxiety ... from the first day," that his anxiety had been "mounting" ever since, and that he had lost 25 pounds since September 2001. *Id.* at 6-7. Plaintiff reported having suffered a panic attack in school the day before, in which his face turned red and he was unable to talk, and stated that he currently felt like he was "in one long panic attack." *Id.* He described the symptoms of his panic attacks, saying he had sweats, tremors and difficulty breathing; felt like he was "outside his body;" and felt like he was "going crazy." *Id.* at 7.

Dr. Packard diagnosed plaintiff with generalized anxiety disorder ("GAD") and panic disorder ("PD"). *Id.* at 9. He prescribed Xanax to treat the symptoms of plaintiff's disorders, and directed plaintiff to resume taking Paxil at the same dose prescribed by Dr. Gerkin. *Id.* at 9. Plaintiff recalls that Dr. Packard told him it could take "up to several weeks" for the medication to be effective, 2d Petrone Dep. at 101, but neither plaintiff nor Dr. Packard recalled discussing whether plaintiff could return to work the following day. *Id.* at 100; Packard Dep. at 13-14.

Plaintiff attempted to return to work on Thursday, January 10, 2002. 2d Petrone Dep. at 100-01. However, as plaintiff walked across the parking lot toward the school, his throat "closed up" and he "started having a panic attack." *Id.* at 102. Plaintiff returned to his car, waited "a few minutes" for the panic attack to end, and drove home. *Id.* at 102-03.

Later that day, plaintiff then called Dr. Packard, who told plaintiff to take time off from work to allow the medications to stabilize him. Pl. 56.1 Statement at ¶ 22; Def. 56.1 Statement at ¶ 22. At his December 2004 deposition, plaintiff recalled that he "pressed" Dr. Packard for information concerning when the medication would become effective. 2d Petrone Dep. at 104. Although plaintiff could not recall the "specific contents of the conversation," plaintiff testified that he thought Dr. Packard said "it could take up to several weeks." *Id.*

Plaintiff then called Stephen Lerner, his union's grievance chairman, to ask what he should do if he needed to be out of work for a while. Pl. 56.1 Statement at ¶ 24; Def. 56.1 Statement at ¶ 24. Lerner advised him to contact Loretta Cahill, the District's personnel assistant, regarding the District's leave policy. *Id.* According to plaintiff, Lerner also advised him of a provision in the collective bargaining agreement between the District and the Hampton Bays Teachers' Association relating to additional sick days. 2d Petrone Dep. at 112. Under the collective bargaining agreement, teachers automatically received ten sick days per year. Pl. 56.1 Statement at ¶ 28; Def. 56.1 Statement at ¶ 28; Kleinberg Dec., Ex. I, Art. XXIII(A). However, the agreement permitted teachers to request ten additional days, which could be granted at the District's discretion, Pl. 56.1 Statement at ¶ 29; Def. 56.1 Statement at ¶ 29, and yet another ten days, which could be granted at the discretion of the School Board. Kleinberg Dec., Ex. I, Art. XXIII(A).

Plaintiff called Cahill on January 10, 2002, but did not disclose to Cahill the nature of his illness, saying only that he was ill and might need to be out for a while. Pl. 56.1 Statement at ¶ 25; Def. 56.1 Statement at ¶ 25. Cahill instructed plaintiff to get a note from his doctor. Pl. 56.1 Statement at ¶ 26; Def. 56.1 Statement at ¶ 26. Plaintiff did not call anybody else associated with the District. 2d Petrone Dep. at 108.

The next day, plaintiff wrote a letter to defendant J. Bruce McKenna, the District Superintendent, requesting ten additional sick days. Pl. 56.1 Statement at ¶ 30; Def. 56.1 Statement at ¶ 30; Kleinberg Dec., Ex. J. Plaintiff's January 11, 2002, letter did not reveal the nature of plaintiff's illness, but stated that a letter would "be forthcoming to your office from my physician William S. Packard, M.D. detailing [the] ailment." Kleinberg Dec., Ex. J. That letter, however, was not written until January 16, 2002, when Dr. Packard penned a four-sentence note revealing that plaintiff had been diagnosed with GAD and PD and was being treated with Paxil and Xanax. Kleinberg Dec., Ex. L. Dr. Packard's note, addressed to "Whom it May Concern," stated that plaintiff was "currently unable to work," but did not indicate when plaintiff might return to work. *Id.*; Pl. 56.1 Statement at ¶ 33; Def. 56.1 Statement at ¶ 33. Nonetheless, on January 16, 2002, McKenna granted plaintiff ten additional sick days. Pl. 56.1 Statement at ¶ 31; Def. 56.1 Statement at ¶ 31.

On the same day that McKenna granted plaintiff the ten additional days, plaintiff visited Dr. Packard for a second time. According to Dr. Packard, plaintiff said that he was feeling "much better," that he was sleeping "okay," and that his appetite had improved. Packard Dep. at 15. Plaintiff also reported that he was "[l]ess nervous overall," although he was still "trying to stay home and be calm." *Id.* Dr. Packard observed that plaintiff "look[ed] much less anxious," but also observed that plaintiff exhibited some "fidgeting and restlessness." *Id.* The doctor increased plaintiff's daily dose of Paxil from 20 to 30 milligrams, and increased his dose of Xanax from three to four milligrams per day. *Id.* at 15-16.

Sometime during the week of January 14, 2002, defendant Sam McAleese, the Principal of Hampton Bays Second School, began to become concerned about the lack of continuity of instruction in plaintiff's classes. January 28, 2005, Deposition of Samuel McAleese ("McAleese

Dep.") (attached as Exhibit E to the Kleinberg Dec.) at 35, 41. At some juncture, McAleese discussed those concerns with McKenna. *Id.* at 41. Although plaintiff may have attempted to call either McAleese or McKenna on January 14, 2002, plaintiff concedes that he did not succeed in reaching either party on that date. Pl. 56.1 Statement at ¶ 45.

On January 22, 2002, McKenna called Dr. Packard to ask when plaintiff would be able to return to work. However, Dr. Packard was unable to provide a specific date, telling McKenna it was "too early to tell." Pl. 56.1 Statement at ¶ 37; Def. 56.1 Statement at ¶ 37; Kleinberg Dec., Ex. W. There is nothing in the record to indicate that Dr. Packard suggested, or that the two men discussed, granting plaintiff a leave of absence.

At some point, plaintiff spoke on the telephone with McAleese. By the time of his December 2004 deposition, plaintiff could not recall the exact date on which the conversation took place, but believed that it was within two weeks of his January 11, 2002, letter requesting ten additional days of sick leave. 2d Petrone Dep. at 116. A record of calls placed from plaintiff's cell phone – the only phone he had at that time – indicates that plaintiff placed a call to McAleese's personal office telephone on January 24, 2002. *Id.* at 136; McAleese Dep., Ex. 5.

During that telephone conversation, plaintiff was unable to give McAleese a specific date on which he would be able to return. 2d Petrone Dep. at 119. Rather, plaintiff believes that he gave McAleese "a general range of time," telling him "it would be between a few and several weeks." *Id.* at 120-21. McAleese told plaintiff to notify him as soon as he was ready to return to work, and plaintiff agreed to do so. *Id.* at 121. Plaintiff never had another conversation with McAleese. *Id.* at 145.

During his January 29, 2002, visit to Dr. Packard, plaintiff reported feeling "substantially better." Packard Dep. at 23. Although plaintiff told Dr. Packard that he did not feel "totally

8

himself" and was still experiencing some anxiety and insomnia, he was no longer having full-blown panic attacks. *Id.* However, plaintiff expressed a reluctance to return to work, telling Dr. Packard that he was "not sure if he want[ed] to continue being a teacher or if it ... [was] the school that ... [was] the problem." *Id.* at 24.

On his February 5, 2002, visit to Dr. Packard, plaintiff reported "feeling better overall." Packard Dep. at 25. He was still experiencing "anxiety symptoms," but reported no trouble sleeping or eating. *Id.* Plaintiff told Dr. Packard he felt strange about not working, and that there "were some jobs here he [could] have," but that he was not "sure what he want[ed] to do." *Id.* Plaintiff also announced that he was "going to [the] Florida Keys with friends to go fishing for a week in two weeks." *Id.*

By all accounts, plaintiff did not keep McAleese updated on his medical condition. Although plaintiff alleges, and plaintiff's telephone records reflect, that he called McAleese's office on February 5, 2002, 2d Petrone Dep. at 138; McAleese Dep., Ex. 5, plaintiff concedes that he was unable to reach McAleese on that date. Pl. 56.1 Statement at ¶ 45. For his part, McAleese claims that he telephoned plaintiff on at least two occasions, but that plaintiff never returned his calls. McAleese Dep. at 102, 104-05.

Eventually, during one of their several conversations regarding plaintiff, McAleese complained to McKenna that plaintiff was not returning his calls. McAleese Dep. at 37-38, 66, 71. On February 8, 2002, McKenna sent plaintiff a letter regarding his perceived lack of communication. That letter stated, in pertinent part:

> Your building principal, Sam McAleese, advised me that you have not been returning his phone calls. It is critical that we know the periods of time for which you will be unable to perform the duties of your job as a Social Studies teacher in the school district. It is imperative that your doctor inform us of his prognosis as to when

you will be able to return to work. As you must understand, continuity of instruction with the same teacher is of great importance regarding the academic success of our students.

Kleinberg Dec., Ex. M.

McKenna's letter also broached the subject of placing plaintiff on a leave of absence. Plaintiff had exhausted his ten additional sick days on February 1, 2002, *see* Kleinberg Dec., Ex. H, and Cahill advised McKenna that plaintiff's health insurance and other benefits would be protected if he were placed on leave pursuant to the Family and Medical Leave Act ("FMLA"). May 6, 2005, Deposition of J. Bruce McKenna ("McKenna Dep.") (attached as Exhibit G to the Kleinberg Dec.) at 42. Accordingly, McKenna wrote:

> If you are unable to return to work within a short period of time, I would like to offer you the opportunity for a fixed term leave of absence without pay through the end of the school year. That way, we should be able to provide your students with continuity of instruction for that fixed term of time. You are hereby directed to call me regarding your interest in an agreed upon fixed term leave of absence.

> At the current time, it is our intention to ask the Board of Education at their Regular meeting on Tuesday, February 12, 2002 to designate your absence from work as Family and Medical Leave Act leave on an unpaid basis for the period of time commencing February 13, 2002 for a period of up to 12 weeks. During the time of such leave, you will be entitled to all medical benefits as if you were on payroll.

Kleinberg Dec., Ex. M.

Plaintiff claims that by the time he received McKenna's letter, his condition had improved and he was "probably very close" to being ready to return to work. 2d Petrone Dep. at 147. Uncertain as to why McKenna was proposing to place him on leave, which he had not requested, plaintiff attempted to call McKenna. *Id.* at 148. However, plaintiff did not reach McKenna, and does not recall if he even left a message. *Id.* at 149.

10

Plaintiff claims he also called Lerner, who said he would attempt to obtain a copy of McKenna's letter. *Id.* at 146. However, plaintiff himself does not think that Lerner managed to talk to McKenna before the Board meeting on Wednesday, February 12, 2002. *Id.* at 150. Plaintiff never provided the written prognosis which McKenna had requested. Pl. 56.1 Statement at ¶ 48; Def. 56.1 Statement at ¶ 48.

On February 12, 2002, McKenna appeared before the five-member School Board to recommend that plaintiff be placed on leave under the FMLA. In an executive session attended only by the Board members and the assistant superintendent, McKenna may have informed the Board that he thought plaintiff was having a nervous breakdown. McKenna Dep. at 44-45, 95. However, at his May 2005 deposition, McKenna did not know whether he had actually used the term, "nervous breakdown," in describing plaintiff's condition. *Id.* at 44. The Board adopted McKenna's recommendation, and granted plaintiff leave "on an unpaid basis for the period commencing February 13, 2002 for up to 12 weeks." Kleinberg Dec., Ex. N.

Although plaintiff did not receive formal notification of the Board's action until sometime in early March 2002, *see id.*, plaintiff had a telephone conversation sometime before then in which he learned that he had been placed on leave. 2d Petrone Dep. at 164-65. Plaintiff did not contact McKenna or McAleese thereafter to complain about being placed on leave or to announce that he was prepared to return. *Id.* at 171. Indeed, at his visit to Dr. Packard on February 26, 2002, plaintiff expressed uncertainty about ever returning to work at the District. Although plaintiff told Dr. Packard that he felt "well," having had a "nice trip" to Florida with his friends and experiencing "only a little anxiety" and "[n]o full-blown panic attacks" over the preceding three weeks, plaintiff said he was "thinking he'[d] take the spring off and work for

friends as a clammer for the summer." Packard Dep. at 27. Plaintiff said he was "[n]ot sure about fall," telling Dr. Packard he "[c]ould teach in California or New York City." *Id.*

Less than a week later, plaintiff tendered his resignation in a letter received by McKenna's office on March 4, 2002. Although it is clear that the resignation followed discussions between Lerner and McKenna, there is conflicting evidence concerning who initiated these discussions. Lerner claims that McKenna summoned him to McKenna's office, where he expressed dissatisfaction with plaintiff's failure to return calls and teaching abilities, called plaintiff "a nut," expressed a determination to terminate plaintiff, and requested Lerner's assistance in brokering a deal for plaintiff's resignation. Lerner Dep. at 16-27, 76-77. McKenna, on the other hand, claims that Lerner suggested the possibility of resignation, asking McKenna, "How would you like his resignation?" McKenna Dep. at 46. McKenna recalls that he replied, "I'd love it," and that he and Lerner proceeded to negotiate a deal. *Id.*

The evening after his meeting with McKenna, Lerner called plaintiff at home and told him that he could either resign or be terminated. Petrone Dep. at 48; 2d Petrone Dep. at 167. According to both plaintiff and Lerner, plaintiff told Lerner that he did not want to resign, but Lerner convinced him that, as an untenured teacher, he had little choice but to do so. Petrone Dep. at 52-53; Lerner Dep. at 47-48. During that conversation or subsequent conversations, plaintiff and Lerner discussed filing a grievance, but Lerner advised against it. Pl. 56.1 Statement at ¶ 63; Def. 56.1 Statement at ¶ 63. Instead, Lerner advised plaintiff to accept the severance package offered by the District. 2d Petrone Dep. at 178; Lerner Dep. at 47-48.

Eventually, plaintiff decided not to file a grievance but to accept the package worked out by Lerner. Pl. 56.1 Statement at ¶ 63; Def. 56.1 Statement at ¶ 63. He memorialized his understanding of District's offer in his resignation letter to McKenna, which he drafted with

12

Lerner's assistance. Pl. 56.1 Statement at ¶ 60; Def. 56.1 Statement at ¶ 60. That letter reads, in pertinent part:

> After discussions with my union representative I understand that you have agreed to issue me fifteen additional paid days (up to and including winter break, February 5-February 25, 2002). I have also been informed that I will be receiving disability benefits in accordance with the district's disability insurance policy effective the second week of March (completion of 60 day wait period). In addition I understand I will receive my full medical benefits until September 01, 2002, after that date I will be entitled to an additional 18 months of medical coverage under the COBRA law. I also understand under the COBRA law that I must begin my own medical contributions as of September 02, 2002.

Kleinberg Dec., Ex. O. Plaintiff now admits that the reference to "fifteen additional paid days" was erroneous, in that the District had offered only ten additional days. Pl. 56.1 Statement at ¶ 59; Def. 56.1 Statement at ¶ 59. Plaintiff attributes the error to a miscommunication between him and Lerner. Pl. 56.1 Statement at ¶ 59; Def. 56.1 Statement at ¶ 59.

Although plaintiff never spoke directly with McKenna, McAleese or any other District administrator concerning his resignation, plaintiff claims, based solely on his discussions with Lerner, that he was "forced" to resign. Pl. 56.1 Statement at ¶¶ 61-62; Def. 56.1 Statement at ¶¶ 61-62. His resignation letter, however, makes no allusions to coercion. Rather, that letter states, in pertinent part:

> As a result of my illness, and the unknown prognosis of a specific recovery date, I must resign ... effective September 01, 2002. It is with great regret that I offer my resignation. It is my sincere hope that with my current course of medical treatment, I will be able to return to the educational field in the near future.
>
> I thank you and the Board of Education for your understanding during this very difficult time in my life. I sincerely regret the inconvenience my unexpected illness has caused the district. I also would like to express my sincere apologies ....

Kleinberg Dec., Ex. O.

13

At his December 2004 deposition, plaintiff claimed that Lerner had advised him to make the resignation "sound totally voluntary." 2d Petrone Dep. at 184. According to plaintiff, Lerner indicated that if he implied "in any way whatsoever that this was under duress or forced that the deal would be off," and he would be terminated. *Id.* Lerner admits that he spoke to plaintiff about how he should draft his letter to McKenna, but denies that he ever told plaintiff that the District wanted the letter to appear voluntary. Lerner Dep. at 58.

On March 4, 2002, plaintiff wrote another letter, informing McAleese of his decision to resign. Pl. 56.1 Statement at ¶ 65; Def. 56.1 Statement at ¶ 65; Kleinberg Dec., Ex. P. That letter begins by attempting to "clear up any misunderstandings you may have due to the perception of lack of information I have provided you." Kleinberg Dec., Ex. P. The letter states:

> [D]uring our last phone conversation you had asked me to inform you as soon as I knew when I could return to work. Since my physician to this day cannot provide me with that information, I was not able to even guess as to when I could return.

*Id.* After describing his ailments – his GAD and PD, as well as an intestinal fissure – plaintiff concludes the letter by writing:

> I decided along with [sic] consulting with Steve Lerner that getting healthy should be my top priority. Despite my misgivings about resigning from teaching in my first year, I felt that I would not be able to give the kids my best effort in educating while simultaneously battling these ailments. I sincerely hope you understand my position.

*Id.*

On March 19, 2002, McKenna appeared before the School Board in connection with plaintiff's resignation. In the executive session, McKenna called plaintiff a "lousy teacher," and at least implied to the School Board that his resignation resulted in "no great instructional loss." McKenna Dep. at 71-72. In responding to an inquiry from Board members, McKenna also said

14

something "to the effect of 'he had a tough time' or 'a mental breakdown.'" Pl. 56.1 Statement at ¶ 89; Def. 56.1 Statement at ¶ 89. The Board then voted to accept plaintiff's resignation, effective September 1, 2002, and to grant plaintiff the ten additional days of sick leave, effective February 5th through February 25th, 2002. Pl. 56.1 Statement at ¶ 67; Def. 56.1 Statement at ¶ 67; Kleinberg Dec., Ex. Q. The District notified plaintiff of the Board's actions in a letter dated March 20, 2002. *See* Kleinberg Dec., Ex. Q.

On March 26, 2002, plaintiff visited Dr. Packard for the first time since late February 2002. Although plaintiff claims he was "very emotional" when Lerner told him he had to resign or be fired, 2d Petrone Dep. at 175, and Lerner described him as "more than a little distraught," Lerner Dep. at 53, Dr. Packard's notes for that date contain no evidence that plaintiff even mentioned this ostensibly traumatic incident. Rather, Dr. Packard's notes reflect that plaintiff was annoyed with the school's personnel office for failing to tell him that he had to contact the insurance company to claim disability benefits. Packard Dep. at 30. Dr. Packard did not note a change in plaintiff's anxiety. *Id.* at 36.

On March 29, 2002, Dr. Packard completed a form entitled "Attending Physician's Statement," presumably in connection with plaintiff's disability claim. Packard Dep. at 67-68. On that form, Dr. Packard opined that plaintiff was then unable to engage in "stress situations," such as dealing with discipline problems in a classroom or dealing with a "large class load." *Id.* at 68-69; Pl. 56.1 Statement at ¶ 68; Def. 56.1 Statement at ¶ 68.

Plaintiff appeared "visibly worse" to Dr. Packard at the time of his next visit, on April 30, 2002. Packard Dep. at 37, 38. According to Dr. Packard's notes for that date, plaintiff was "very upset" because the District's insurance company had yet to approve his disability claim. *Id.*

Plaintiff, who had not received a paycheck in months and was being pursued by his creditors, reported that he was "not sleeping" and felt that "his stress had increased." *Id.*

Sometime prior to plaintiff's next visit with Dr. Packard on May 28, 2002, plaintiff received word that the District's disability carrier had denied his claim. Packard Dep. at 39. The parties agree that the carrier, General Electric Group Life Assurance Co., denied the claim because it determined that plaintiff had a pre-existing condition, and that the District played no part in making that determination. Pl. 56.1 Statement at ¶¶ 71-72; Def. 56.1 Statement at ¶¶ 71-72. According to Dr. Packard's notes for May 28, 2002, plaintiff reported talking to a lawyer about appealing the insurer's disability determination. Packard Dep. at 39. Plaintiff also reported that his panic attacks and anxiety were under control, and that he was working "on the bay" and enjoying it. *Id.*

Plaintiff was still working when he next saw Dr. Packard on June 25, 2002, and when he saw the doctor again in late July 2002. *Id.* at 39-40. During the latter visit, plaintiff told Dr. Packard that he had met with a labor lawyer, who reportedly told plaintiff that the District had violated his rights by asking him to resign when he was disabled. *Id.* at 40. Plaintiff also stated that the lawyer had advised him to rescind his resignation and that he had scheduled an interview with the New York State Division of Human Rights. *Id.*

On July 22, 2002, plaintiff attempted to rescind his resignation by writing a letter to Diane Albano, the District Clerk who had mailed him a copy of the Board resolution accepting his resignation. Kleinberg Dec., Ex. T. That letter, copies of which were sent to McKenna, McAleese and Lerner, said only, " I hereby rescind my resignation letter of intent that was to be effective by 09/01/2002." *Id.* McKenna recalls that, upon receiving his copy of the letter, he

telephoned the District's attorney, then instructed the Clerk to disregard plaintiff's letter. McKenna Dep. at 80.

### The Charges of Discrimination

On or about August 13, 2002, plaintiff filed a complaint with the New York State Division of Human Rights (the "SDHR"). Pl. 56.1 Statement at ¶ 75; Def. 56.1 Statement at ¶ 75. In that complaint, plaintiff alleged that his GAD was "an impairment which is a disability within the meaning of the New York State Human Rights Law," and that he informed Cahill that he was "initiating disability leave and benefits" in early January 2002. Kleinberg Dec., Ex. U. Plaintiff further alleged that in February 2002, Lerner had informed him that McKenna and McAleese "wanted [him] to resign because of the type of illness [he] had." *Id.* Plaintiff admitted that he resigned on March 4, 2002, and claimed that McKenna had expressly rejected his July 22, 2002, attempt to rescind his resignation. *Id.* Based on these allegations, plaintiff charged the District with discriminating against him on account of his disability "by forcing [his] resignation, failing to reinstate [him] and failing to pay ... disability benefits and by refusing to give [him his] job back." *Id.*

In late August 2002, plaintiff had knee surgery for an injury he sustained while playing racquetball the previous month. Packard Dep. at 40-41. Unable to continue his work as a clammer, he applied for unemployment benefits with the New York State Department of Labor. Relying on the School Board's February 12, 2002, resolution, plaintiff executed an affidavit in which he stated that he had been placed on leave as of February 13, 2002, and was still employed by the District. Petrone Dep. at 66-67. Sometime after filing his complaint with the SDHR, plaintiff received a call from a Department of Labor employee who told him she had attempted to

17

verify his employment history and had been told by the District that he had resigned as of February 1, 2002. *Id.* at 66.

Believing that the District had engaged in "a blatant act of retaliation," *id.* at 67, plaintiff amended his complaint with the SDHR. In an Amendment to the Complaint dated September 10, 2002, plaintiff alleged that the District "attempted to block [his] unemployment claim by stating that [he] had quit [his] job and by denying the fact of [his] leave of absence." Kleinberg Dec., Ex. U. Plaintiff alleged that he had been subjected to "retaliation for ... having opposed unlawful discrimination practices, in violation of Section 296 of the NYS Human Rights Law." *Id.*

In October 2002, Cahill, who handled the processing of the District employees' insurance benefits, reviewed a list of all employees receiving health insurance. Pl. 56.1 Statement at ¶¶ 77, 79; Def. 56.1 Statement at ¶¶ 77, 79. Aware that plaintiff had resigned months earlier, and in accordance with her responsibility to terminate coverage for those persons who were no longer active employees of the District, Cahill took the necessary steps to terminate plaintiff's health insurance coverage as of May 1, 2002. Pl. 56.1 Statement at ¶¶ 78-79; Def. 56.1 Statement at ¶¶ 78-79.

In October 2002, plaintiff began receiving bills from his health insurer, Empire Blue Cross Blue Shield ("Empire"), seeking reimbursement for amounts Empire paid for services rendered to plaintiff since May 2002. Petrone Dep. at 69-70. Plaintiff contacted Empire and was informed that the District had changed the termination date from September 2002 to April 29, 2002. *Id.* at 70. Plaintiff was further informed that the change had been made in early October 2002, after he filed his complaint and the amendment thereto with the SDHR. *Id.*

18

Plaintiff now concedes that no one ever informed Cahill at any time prior to the cancellation of plaintiff's benefits that plaintiff was to receive medical benefits following his resignation. Pl. 56.1 Statement at ¶ 80; Def. 56.1 Statement at ¶ 80. Plaintiff also concedes that Cahill was not aware that plaintiff had filed a complaint with the SDHR, and that no one else in the District told Cahill to terminate plaintiff's health insurance. Pl. 56.1 Statement at ¶ 81; Def. 56.1 Statement at ¶ 81. However, in late 2002, plaintiff did not know these facts and believed that the District had engaged in "another blatant act of retaliation." Petrone Dep. at 70-71. On October 30, 2002, plaintiff filed another complaint with the SDHR, charging the District with "violating the terms of [his] forced resignation agreement, because of [his] disability," and further retaliating against him "for [his] prior filing of a discrimination complaint." Kleinberg Dec., Ex. Z.

Before the District even received the complaint, McKenna learned that plaintiff's health insurance had been cancelled. Realizing that he had "screwed up" by not informing Cahill of the deal with plaintiff, McKenna told Cahill to restore plaintiff's benefits. McKenna Dep. at 65. On October 31, 2002 – the day after plaintiff filed his second complaint with the SDHR – Cahill called the New York State Department of Civil Service and requested that plaintiff's "coverage ... be re-activated as soon as possible." Kleinberg Dec., Ex. X. Plaintiff's medical insurance coverage was reinstated on November 1, 2002, without a lapse in coverage. Pl. 56.1 Statement at ¶ 83; Def. 56.1 Statement at ¶ 83.

Following the District's refusal to rescind his resignation, plaintiff never applied for another teaching job in New York State. Pl. 56.1 Statement at ¶ 87; Def. 56.1 Statement at ¶ 87. Plaintiff believed that "because of [the] legal situation with the ... [D]istrict and the hostility that

[he] believe[d] Dr. McKenna had already exhibited towards [him,] that it would probably be impossible ... to be a teacher on Long Island." 2d Petrone Dep. at 264.

### *The Complaint and Amended Complaint*

In September 2003, plaintiff commenced this action against the District, McKenna, McAleese, and a single "Doe" defendant, alleging that the District discriminated against him on the basis of his mental illness, that McKenna and McAleese "violated his liberty interest in his good name and reputation," and that McKenna and McAleese slandered him by falsely reporting that he had suffered a nervous breakdown and no longer wanted to teach his students. Complaint at 1. The complaint further alleged that a "John Doe" had retaliated against plaintiff by providing "false information to the New York State Civil Service Department" that "impacted adversely on [plaintiff's] ability to receive medical insurance benefits to which he was entitled." *Id.* at 2. The complaint demanded "[a]n injunction directing the school district to provide fair and reasonable positive recommendations on plaintiff's behalf to all prospective employers," plus compensatory and punitive damages. Complaint at 13.

In May 2004, plaintiff amended his complaint to substitute Loretta Cahill for the "Doe" defendant. As amended, plaintiff's complaint raises ten causes of action. The first two causes of action allege that the District violated the ADA and Section 504 of the Rehabilitation Act of 1973, respectively, by "forcing [plaintiff] to resign his position after learning that [he] suffered from generalized anxiety disorder and panic disorder." Amended Complaint at ¶ 55. The third and fourth causes of action allege that the District violated the ADA and Section 504 of the Rehabilitation Act, respectively, by "failing to provide [plaintiff] with a reasonable accommodation that would have enabled him to continue teaching." *Id.* at ¶ 57. The fifth cause of action alleges that the District violated the ADA "by failing to engage [plaintiff] in an

interactive process that would have facilitated the provision of a reasonable accommodation ...." *Id.* at ¶ 59.

The sixth and seventh causes of action are brought under 42 U.S.C. § 1983 and allege specific violations of plaintiff's federal constitutional rights. The sixth claim charges that McKenna and McAleese violated plaintiff's "liberty interest in his good name and reputation and hence further violated the Due Process Cause of the Fourteenth Amendment" by (1) informing the School Board that plaintiff suffered a "nervous breakdown" and quit, (2) telling the Board that plaintiff was "a lousy teacher" who should "never have been hired," and (3) informing students in plaintiff's classes that plaintiff had no desire to teach them anymore. *Id.* at ¶ 61. The seventh cause of action alleges that Cahill, in causing plaintiff's insurance coverage to be cancelled after he filed his complaint with the SDHR, retaliated against plaintiff for exercising his First Amendment right to petition for redress of grievances, in violation of the Fourteenth Amendment. *Id.* at ¶ 63.

The remaining three causes of action allege pendent claims under New York State law. The eighth cause of action alleges that the District violated New York State Executive Law § 296 by forcing plaintiff to resign after learning that he suffered from generalized anxiety disorder and panic disorder. *Id.* at ¶ 65. The ninth cause of action alleges that the District breached its contract with plaintiff by failing to provide "insurance benefits" to plaintiff through September 1, 2002. *Id.* at ¶ 67. Finally, the tenth cause of action asserts that McKenna and McAleese slandered plaintiff by (1) informing the School Board that plaintiff suffered a "nervous breakdown" and quit, (2) telling the Board that plaintiff was "a lousy teacher" who should "never have been hired," and (3) informing students in plaintiff's classes that plaintiff had no desire to teach them anymore. *Id.* at ¶ 69.

21

### *Defendants' Motion for Summary Judgment*

Defendants now move for summary judgment in a motion which raises eleven separate arguments. The first four arguments – which are listed as subparts of Point I in Defendants' Memorandum of Law ("Defendants' Memo") – relate to plaintiff's claims under the ADA and the New York State Human Rights Law ("HRL"), N.Y. Executive Law § 296.[2] First, defendants argue that plaintiff's GAD and PD are not "disabilities" under the ADA because, *inter alia*, these impairments could be corrected through use of medication. Second, defendants assert that plaintiff was not "qualified" for his position because he was incapable of regular attendance. Defendants also argue, third, that plaintiff never sought a "reasonable accommodation" and, fourth, that the District was not obligated to offer any accommodation to plaintiff.

Defendants' fifth argument relates solely to the sixth cause of action in the Amended Complaint, which raises a "stigma-plus" claim. Defendants argue, *inter alia*, that plaintiff's allegations that McKenna told the School Board that plaintiff suffered a "nervous breakdown" and quit are "insufficient to support plaintiff's claim." Defendants' Memo at 14-15. Defendants further argue that plaintiff has the burden to prove that he was unable "to find other government employment as a result of a failure to have a name-clearing hearing." *Id.* at 15.

Defendants' sixth argument relates to plaintiff's seventh cause of action, which alleged that Cahill retaliated against plaintiff. Detailing evidence that Cahill's cancellation of plaintiffs' medical insurance was an "inadvertent oversight and entirely unrelated to plaintiff's filing of a complaint" with the SDHR, defendants argue that they have set forth a non-discriminatory reason

---

[2]It is unclear whether defendants also seek dismissal of the Rehabilitation Act claims. None of the first four arguments refer to the Rehabilitation Act. However, Defendants' Memo concludes by requesting that all of plaintiff's claims – not only those brought under the ADA or HRL – be dismissed.

for Cahill's actions. *Id.* at 16. Defendants further assert that plaintiff lacks proof that this reason is pretextual and that plaintiff's retaliation claim must, therefore, be dismissed. *Id.* at 16-17.

In their seventh argument, defendants argue that "the individual defendants are not subject to liability under the ADA." *Id.* at 19. Defendants contend that "the claims" against defendants McKenna, McAleese, and Cahill should, therefore, be dismissed as a matter of law. However, it is unclear to which "claims" defendants refer. The only three claims brought pursuant to the ADA – namely, the first, third and fifth causes of action – do not seek to impose liability on any of the individual defendants.

Defendants' final four arguments relate solely to the pendent state claims. Although the last of these arguments urges this Court to refrain from exercising pendent jurisdiction, the other three arguments address the merits of plaintiff's claims. Defendant's eighth argument seeks to dismiss plaintiff's claims for breach of contract and slander for failure to file a notice of claim, as required under New York's General Municipal Law. Defendants' ninth argument, which interprets plaintiff's ninth cause of action as alleging a breach of both an agreement to provide plaintiff with medical insurance through September 1, 2002, and an agreement to provide plaintiff with disability benefits, asserts that plaintiff's breach of contract claim fails as a matter of law for three reasons. First, citing principally to *Matter of Board of Education v. Ambach*, 70 N.Y.2d 501, 522 N.Y.S.2d 831 (1987), defendants argue that plaintiff cannot sue the District because the collective bargaining agreement provides for a grievance procedure. Second, defendants argue that the District was not responsible for the denial of disability benefits, since plaintiff's eligibility for those benefits was determined solely by the District's disability insurance carrier, General Electric Group Life Assurance Co. Third, defendants assert ERISA preemption in a single sentence which reads:

> Further, as the breach of contract claim relates to the District's
> disability benefit plan, a state law claim is preempted by federal
> law, specifically the Employee Retirement Income Security Act
> ("ERISA"). *See, e.g., Kok v. First Unum Life Ins. Co.*, 154 F.
> Supp. 2d 777, 780 (S.D.N.Y. 2000).

Defendants' Memo at 22.

Defendants' tenth argument asserts that plaintiff's tenth cause of action, alleging slander, fails as a matter of law. Defendants principally argue that the allegedly slanderous comments were privileged in that they were made about an employee in an employment context and to persons having a corresponding interest or duty relating to that employee. *Id.* at 23-24. Defendants also argue that, to the extent the comments constituted criticism of an employee's work performance, those comments constituted protected speech. *Id.* at 24.

### *Plaintiff's Motion to Amend his Pleading*

Plaintiff not only opposes defendants' motion for summary judgment, but moves pursuant to Rule 15(a) of the Federal Rules of Civil Procedure for permission to amend his First Amended Complaint. Plaintiff's proposed Second Amended Complaint (attached as Exhibit A to the May 26, 2006, Declaration of William Brooks (the "Brooks Dec.")) differs from the First Amended Complaint in three significant respects. First, plaintiff seeks to "voluntarily withdraw" the seventh cause of action – alleging that Cahill retaliated against plaintiff by retroactively cancelling his health insurance – and to "withdraw [Cahill] as a named defendant." Plaintiff's Memorandum of Law in Support of Motion to Amend the Complaint ("Plaintiff's 15(a) Memo") at 2. Accordingly, Cahill is no longer named as a defendant in the caption of the proposed Second Amended Complaint and the paragraph describing her has been omitted from the section entitled "Parties." In addition, the seventh cause of action has been omitted, so that there are only nine causes of action in the proposed Second Amended Complaint.

Second, plaintiff seeks to amend the ninth cause of action in the First Amended Complaint – which alleged that the District breached its contract with plaintiff by failing to provide "insurance benefits" – to clarify that the benefits at issue are disability benefits, and not health insurance benefits. Plaintiff's counsel alleges that he originally understood plaintiff to say that the District reneged on its promise to provide health insurance benefits until September 1, 2002. Brooks Dec. at ¶ 4. However, plaintiff's counsel learned during discovery that the temporary discontinuation of health insurance benefits was accidental, and that the District had breached their agreement to provide disability benefits. Accordingly, plaintiff seeks to amend this cause of action by substituting the term, "disability benefits," for the term, "insurance benefits," and to eliminate allegations concerning health insurance benefits. For example, the First Amended Complaint alleges that the District "took steps that resulted in [plaintiff] failing to receive disability and medical benefits to which he was entitled pursuant to the agreement," and that plaintiff "did not receive disability and medical benefits between April 30, 2001 and October 1, 2001 [sic]." First Amended Complaint at ¶¶ 43, 46. The proposed Second Amended Complaint alleges that "[d]espite HBUFSD's promise to provide [plaintiff] with disability benefits in return for his resignation, at no time did the plaintiff receive the promised disability benefits." Brooks Dec., Ex. A, at ¶ 42.

Third, plaintiff seeks to amend a paragraph in the "Factual Allegations" section, relating to what Dr. Packard told the District on January 16, 2002, to conform to the proof. In the First Amended Complaint, this paragraph alleged that Dr. Packard informed the District that "plaintiff should be given a leave of three to eight weeks, which would enable medication that had been prescribed to become effective." First Amended Complaint at ¶ 23. In the proposed Second Amended Complaint, this paragraph alleges only that Dr. Packard informed the District that

25

plaintiff "required a leave of absence because of his medical condition." Proposed Second Amended Complaint at ¶ 22.

Defendants have no objection to plaintiff's request to withdraw the seventh cause of action or to dismiss Cahill from the action. Defendants' Response to Plaintiff's Rule 15(a) Motion ("Defendants' 15(a) Response") at 1. Moreover, defendants imply that amendment of the First Amended Complaint's ninth cause of action is unnecessary because defendants understood the term "insurance benefits," as used in that cause of action, to encompass "disability benefits." Indeed, defendants point out that their motion for summary judgment "seeks the dismissal of plaintiff's breach of contract claim in the context of both health insurance and disability benefits." *Id.* However, defendants object to amending the ninth cause of action "[t]o the extent that plaintiff contends that his 'new' breach of contract claim is somehow different from that previously alleged." *Id.* at 4. Defendants claim that the supporting facts were known to plaintiff years before plaintiff moved to amend his pleading, and that a new claim "will require additional discovery, thereby prejudicing defendants who have litigated the matter for three years ...." *Id.*

Defendants also object to plaintiff's attempts to amend that portion of the complaint which alleges what Dr. Packard told the District about plaintiff's prognosis. Defendants' argue that "[p]laintiff's moving papers wholly fail to proffer any support for the amendment of such an allegation that goes to the heart of many of plaintiff's claims." *Id.* at 4-5. Defendants also represent that permitting plaintiff to amend his pleading in this manner "would result in prejudice to the defendants," *id.* at 5, but are not specific as to how defendants will be prejudiced. Defendants' papers imply, however, that defendants may have been able to fashion additional

arguments in light of plaintiff's admission that Dr. Packard never gave the District any prediction as to when plaintiff might be able to return to work. *Id.*

## *DISCUSSION*

Rule 15(a) of the Federal Rules of Civil Procedure provides that a party may amend its pleading once as a matter of course "before being served with a responsive pleading ... or ... within 20 days after serving the pleading if a responsive pleading is not allowed ...." In all other cases, amendment is permitted only with the opposing party's written consent or with leave of the court. Fed. R. Civ. P. 15(a)(2).

Although Rule 15(a)(2) specifically provides that a court "should freely give leave when justice so requires," it is "within the sound discretion of the district court to grant or deny leave to amend." *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 200 (2d Cir. 2007); *see Foman v. Davis*, 371 U.S. 178, 182 (1962). A district court may deny leave for any "good reason," *McCarthy*, 482 F.3d at 200, such as "undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, [and] futility of the amendment ...." *Foman*, 371 U.S. at 182. However, district courts cannot deny leave in the absence of any "justifying reason." *McCarthy*, 482 F.3d at 200-01 (quoting *Jin v. Metropolitan Life Ins. Co.*, 310 F.3d 84, 101 (2d Cir. 2002)). As the *Foman* Court explained:

> [O]utright refusal to grant the leave without any justifying reason appearing for the denial is not an exercise of discretion; it is merely abuse of that discretion and inconsistent with the spirit of the Federal Rules.

371 U.S. at 182.

In this case, defendants assert that they will be prejudiced in two respects if plaintiff is permitted to amend his pleading in the manner set forth in the proposed Second Amended Complaint. First, defendants argue that they will be prejudiced by having to re-open discovery and further delay this case if "plaintiff contends that his 'new' breach of contract claim is somehow different from that previously alleged." Defendants' 15(a) Memo at 4. Second, defendants assert that they will be prejudiced if plaintiff is permitted to change his allegations concerning what Dr. Packard told the District, implying that they might have been able to raise additional grounds for summary judgment if plaintiff had previously conceded that Dr. Packard never told the District that plaintiff would be unable to work for only three to eight weeks.

This Court is not persuaded that defendants will be prejudiced by the proposed amendments to plaintiff's pleading. First, there is nothing to suggest that the breach of contract claim alleged in the proposed Second Amended Complaint is different from the breach of contract claim alleged in the ninth cause of action in the First Amended Complaint. Indeed, in his reply papers, plaintiff expressly states that he "seeks to amend his complaint ... in order to conform the pleadings to the evidence," and "seeks to clarify his ninth cause of action in order to make clear that ... plaintiff is asserting a breach of contract with respect to disability benefits only." Plaintiff's Memorandum of Law in Further Support of Motion to Amend the Complaint at 1. Since defendants admit that they interpreted the ninth cause of action's reference to "insurance benefits" to encompass "disability benefits," and that their motion for summary judgment "seeks the dismissal of plaintiff's breach of contract claim in the context of both health insurance and disability benefits," Defendants' 15(a) Response at 1, this Court finds that defendants will not be prejudiced by the proposed amendment to plaintiff's breach of contract claim.

28

Second, this Court does not see how defendants will be prejudiced if plaintiff is permitted to amend his allegations concerning what Dr. Packard told the District about when plaintiff might be expected to return. Defendants allege that plaintiff's allegations concerning what Dr. Packard told the District "go[] to the heart of many of plaintiff's claims," and imply that plaintiff's admission that this allegation is unsubstantiated paves the way for two defense arguments: (1) that plaintiff was incapable of regular attendance and, therefore, not a "qualified individual," and (2) that defendants, who were not obligated to hold plaintiff's position open indefinitely, did not deny plaintiff a "reasonable accommodation." Defendants' 15(a) Memo at 5. Yet, defendants' own motion papers show that, at the time they moved for summary judgment, defendants were well aware that plaintiff's allegation regarding Dr. Packard's statements was unsubstantiated. Indeed, defendants' 56.1 Statement expressly refers to that portion of the First Amended Complaint which alleged that "Dr. Packard informed the ... District that plaintiff would only require a leave of 3-8 weeks," then cites portions of the record for the proposition that "Dr. Packard did not inform the District of any anticipated timetable for plaintiff's return to work." Def. 56.1 Statement at ¶¶ 39-40. Moreover, defendants' motion for summary judgment already contains both of the two arguments identified by defendants' papers. Accordingly, defendants' submissions do not persuade this Court that defendants will be prejudiced if plaintiff is permitted to amend the allegation concerning Dr. Packard's statements to the District.

Although this Court concludes that there is no "good reason" for denying plaintiff permission to amend his pleading, this ruling should not be interpreted as condoning the filing of the proposed Second Amended Complaint in its current form. This Court, having reviewed the record in this case in some detail, is uncertain whether plaintiff has an adequate factual basis for

alleging that Dr. Packard "informed" the District on or about January 16, 2002, that plaintiff

"required a leave of absence." *See* Proposed Second Amended Complaint at ¶ 21-23. Dr.

Packard's note dated January 16, 2002, stated only plaintiff was "currently unable to work," but

mentioned neither a "leave of absence" nor the anticipated duration of plaintiff's absence.

Kleinberg Dec., Ex. L. There also appears to be no evidence that Dr. Packard mentioned a "leave

of absence" during his subsequent conversation with McKenna. In addition, the parties agree

that Dr. Packard "never informed the District of any anticipated timetable for plaintiff's return to

work." Pl. 56.1 Statement at ¶ 40; Def. 56.1 Statement at ¶ 40. Rather, when asked by McKenna

when plaintiff would be able to return to work, Dr. Packard said only that it was "too early to

tell." Pl. 56.1 Statement at ¶ 37; Def. 56.1 Statement at ¶ 37; Kleinberg Dec., Ex. W.

When amending his pleading, plaintiff may also wish to clarify his stigma-plus claim,

which appears in both the First Amended Complaint and proposed Second Amended Complaint

as the sixth cause of action. In this cause of action – which is identical in both complaints –

plaintiff alleges that McKenna *and* McAleese (1) "informed members of [the] School Board that

[plaintiff] suffered a 'nervous breakdown' and quit [and that plaintiff] was 'a lousy teacher' who

should 'never have been hired,'" and (2) informed plaintiff's former students that plaintiff had no

desire to teach them anymore. Plaintiff then alleges that these actions violated plaintiff's "liberty

interest in his good name and reputation and hence further violated the Due Process Clause to the

Fourteenth Amendment to the United States Constitution and 42 U.S.C. § 1983."

Section 1983 imposes liability on specific individuals for their violations of a plaintiff's

Constitutional rights. McAleese and McKenna did not jointly commit all of the acts alleged in

the sixth cause of action. This Court is unaware of any evidence suggesting that McAleese made

comments before the School Board, and McKenna denies having ever discussed plaintiff's

absence with his former students. McKenna Dep. at 66. Therefore, plaintiff should specify which defendant – McKenna or McAleese – allegedly committed the specific acts listed in the cause of action.

Plaintiff, who has sought to conform his pleadings to the proof in other respects, may also wish to re-examine the allegations contained in this cause of action to ensure that each has a factual basis. For example, McKenna has admitted telling the Board in executive session that plaintiff was "a lousy teacher," McKenna Dep. at 71, and there is ample evidence that McKenna, in responding to a Board member's inquiry about plaintiff's resignation during an executive session of the District School Board in March 2002, said something "to the effect of 'he had a tough time' or 'a mental breakdown.'" Pl. 56.1 Statement at ¶ 89; Def. 56.1 Statement at ¶ 89; 2d Petrone Dep. at 208. However, at his deposition, McKenna was unsure whether he used the term, "nervous breakdown," and could not recall telling the Board that plaintiff "should never have been hired." McKenna Dep. at 44, 69. Similarly, McAleese adamantly denied having ever told any student at the secondary school that plaintiff had no desire to teach them anymore, McAleese Dep. at 76-77, and this Court is unaware of admissible evidence in the record that would establish the contrary.

In addition, plaintiff may wish to clarify whether the sixth cause of action alleges that plaintiff's professional reputation and competence were impugned by the comments alleged. Second Circuit case law appears to recognize a distinction between cases involving "statements that obviously implicate a plaintiff's good name or honor," and "cases where a plaintiff is claiming that his professional reputation and competence have been impugned." *Patterson v. City of Utica*, 370 F.3d 322, 330 n. 1 (2d Cir. 2004) (citing *Donato v. Plainview-Old Bethpage Cent. Sch. Dist.*, 96 F.3d 623, 630-31 (2d Cir. 1996)). In the former cases, a plaintiff generally is

required to show that the government made stigmatizing statements about him, to prove that the statements were made "public," and to show that the stigmatizing statements were made concurrently in time to plaintiff's dismissal. *See Patterson*, 370 F.3d at 330. In the latter cases, a plaintiff must also prove that future employment opportunities were foreclosed. *Id.* at n. 1. This Court notes, that in moving for summary judgment with respect to this cause of action, defendants read the sixth cause of action as fitting within the latter cases, while plaintiff's response implies that plaintiff is attempting to fit within the former category. By clarifying the category in which plaintiff seeks to fit, plaintiff may be able to avoid motion practice with respect to this cause of action or at least focus motion practice on other issues, such a whether an oral statement made to the School Board in executive session is adequately "public."

Since it is unclear precisely how plaintiff will amend the sixth cause of action or amend the allegations relating to what Dr. Packard told the District, it would be premature to decide defendants' motion for summary judgment at this juncture. Rather, this Court will deem defendants' motion for summary judgment withdrawn until plaintiff has filed his amended pleading and defendants have had an opportunity to determine whether they wish to amend their motion for summary judgment in any respect. This hiatus will also afford both parties to advise the Court whether they believe that the ADA Amendments Act of 2008, 122 Stat. 3553 (the "ADAAA"), is applicable to this case or whether they concur with the several district courts in this Circuit which have already held that the ADAAA does not apply retroactively. *See, e.g., White v. Sears, Roebuck & Co.*, No. 07-CV-4286 (NGG)(MDG), 2009 WL 1140434, at *5 (Apr. 27, 2009) (and cases cited therein).

## *CONCLUSION*

For the reasons set forth above, plaintiff's motion to amend his pleading is granted. Plaintiff shall file his Second Amended Complaint on or before October 5, 2009.

Defendants' motion for summary judgment is deemed withdrawn. Defendants shall review plaintiff's amended pleading and advise this Court by letter, on or before October 23, 2009, whether defendants wish to amend their motion papers or to renew the motion which they previously filed. To the extent that defendants wish to raise additional issues, they shall explain the legal basis for these issues in the manner dictated by paragraph III.B of this Court's Individual Motion Practices.

On or before October 23, 2009, the parties shall confer with each other with regard to whether the ADAAA applies retroactively and whether supplemental briefing on the effect (or lack of effect) of the ADAAA is necessary. Defendants shall advise the Court of the outcome of their discussions with plaintiff in the above-referenced letter.

SO ORDERED.

s/ SLT
SANDRA L. TOWNES
United States District Judge

Dated: September 9, 2009
Brooklyn, New York