UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------------------------------x
JOHN PETRONE,

                                    Plaintiff,

                    – against –

HAMPTON BAYS UNION FREE SCHOOL
DISTRICT, *et al.*,

                                    Defendants.
---------------------------------------------------------------x

<u>**MEMORANDUM AND ORDER**</u>

03-CV-4359 (SLT) (ARL)

**TOWNES, United States District Judge:**

        Plaintiff John Petrone brings this action against his former employer, the Hampton Bays

Union Free School District ("HBUFSD" or "District"), principally alleging that the District

violated the Americans with Disabilities Act and Section 504 of the Rehabilitation Act of 1973

by failing to provide him with a reasonable accommodation for, and forcing him to resign

because of, his mental illness.  Defendants now move for summary judgment.  For the reasons

stated below, defendants' motion is granted with respect to all federal claims and this Court

declines to exercise pendent jurisdiction with respect to plaintiff's state law claims.

*BACKGROUND*

        Except as otherwise indicated, the parties agree on the following facts.  Plaintiff began

working at the District's secondary school as a student teacher in January 2001.  Defendants'

Statement of Undisputed Material Facts Pursuant to Local Civil Rule 56.1 ("Def. 56.1

Statement") at ¶1; Plaintiff's Counter-statement of Material Facts Pursuant to Local Civil Rule

56.1 ("Pl. 56.1 Statement") at ¶1.  In May 2001, at or about the time plaintiff concluded his stint

as a student teacher, the District hired plaintiff as a full-time Social Studies teacher for the 2001-

2002 school year.  Def. 56.1 Statement at ¶¶1-2; Pl. 56.1 Statement at ¶¶1-2.

At the time he was hired, plaintiff was taking a medication to combat nervousness which plaintiff frequently experienced in connection with public speaking. Def. 56.1 Statement at ¶4; Pl. 56.1 Statement at ¶4. A psychiatrist had first prescribed that medication to plaintiff sometime in 2000, but plaintiff was unaware that he suffered from any mental impairments. Def. 56.1 Statement at ¶¶5, 7; Pl. 56.1 Statement at ¶¶5, 7. Accordingly, plaintiff never advised any member of the District's hiring committee – which included defendant Dr. J. Bruce McKenna, then the Superintendent of HBUFSD, and Samuel McAleese, then the Assistant Principal of HBUFSD's secondary school – that he had a medical condition that might affect his ability to teach. Def. 56.1 Statement at ¶¶3, 8; Pl. 56.1 Statement at ¶¶3, 8.

Around the time he began working full-time, plaintiff stopped taking his medication because the Veterans Administration ("VA") Hospital at which his psychiatrist worked did not have evening hours. Def. 56.1 Statement at ¶9; Pl. 56.1 Statement at ¶9. According to plaintiff, "[i]n or about October, 2001, [he] began to feel extremely anxious and tense on a regular basis for no discernable reason." Affidavit of John Petrone dated Mar. 18, 2010 ("Petrone Aff.") at ¶11. He also developed insomnia. Whereas he had been able to sleep 7 or 8 hours a night prior to October 2001, he was sleeping only about 5 hours a night by early October, only 3 to 4 hours in November, and 2 to 3 hours a night in December 2001. *Id.* at ¶¶15-18.

At first, plaintiff's symptoms did not manifest themselves in the classroom, aside from occasions in which his face would become flush. Def. 56.1 Statement at ¶12; Pl. 56.1 Statement at ¶12. However, by the start of January 2002, plaintiff was experiencing "intensified feelings of panic attacks, breathing problems, muscle tremors, and sweating." Def. 56.1 Statement at ¶13; Pl. 56.1 Statement at ¶13. Despite these symptoms, plaintiff managed to work during the first

week of January 2002. Def. 56.1 Statement at ¶14; Pl. 56.1 Statement at ¶14. By the start of the next week, however, plaintiff felt his panic attacks were becoming "extreme" and realized he needed help. Def. 56.1 Statement at ¶15; Pl. 56.1 Statement at ¶15.

On January 9, 2002, plaintiff sought treatment from Dr. William S. Packard, a psychiatrist, who diagnosed plaintiff with Generalized Anxiety Disorder ("GAD") and Panic Disorder ("PD"). Def. 56.1 Statement at ¶18; Pl. 56.1 Statement at ¶18. Dr. Packard believed that plaintiff's symptoms were "severe," and prescribed medication. Def. 56.1 Statement at ¶19; Pl. 56.1 Statement at ¶19. Nonetheless, plaintiff attempted to return to work on Thursday, January 10, 2002. Def. 56.1 Statement at ¶20; Pl. 56.1 Statement at ¶20. As plaintiff walked across the parking lot toward the school, he suffered a "panic attack." *Id.* Plaintiff went home and, later that day, consulted Dr. Packard. Def. 56.1 Statement at ¶¶20, 22; Pl. 56.1 Statement at ¶¶20, 22. Dr. Packard told plaintiff to take time off from work to allow the medication to stabilize him. Def. 56.1 Statement at ¶22; Pl. 56.1 Statement at ¶22. Dr. Packard did not tell plaintiff how long he would need to be absent, indicating that the medication worked differently for different people. Def. 56.1 Statement at ¶23; Pl. 56.1 Statement at ¶23.

Plaintiff then called Stephen Lerner, a union representative, to ask what he should do if he needed to be out of work for a while. Def. 56.1 Statement at ¶24; Pl. 56.1 Statement at ¶24. Lerner advised him to contact Loretta Cahill, the District's personnel assistant, regarding the District's leave policy. *Id.* According to plaintiff, Lerner also advised him of a provision in the collective bargaining agreement between the District and the Hampton Bays Teachers' Association relating to additional sick days. Deposition of John Petrone dated Dec. 23, 2004

(the "2004 Petrone Dep.") at 112-13.[1]  Under that collective bargaining agreement, plaintiff was entitled to ten sick days per year.  Def. 56.1 Statement at ¶28; Pl. 56.1 Statement at ¶28.  However, the agreement allowed a teacher to request ten additional days, which could be granted at the District's discretion.  Def. 56.1 Statement at ¶29; Pl. 56.1 Statement at ¶29.

Plaintiff called Cahill on January 10, 2002, but did not disclose to Cahill the nature of his illness, saying only that he was ill and might need to be out for a while.  Def. 56.1 Statement at ¶25; Pl. 56.1 Statement at ¶25.  Cahill instructed plaintiff to get a note from his doctor.  Def. 56.1 Statement at ¶26; Pl. 56.1 Statement at ¶26.  However, plaintiff did not obtain that note until January 16, 2002, when he visited Dr. Packard for the second time.

On January 11, 2002, plaintiff wrote a letter to defendant McKenna, the District Superintendent, requesting ten additional sick days.  Def. 56.1 Statement at ¶30; Pl. 56.1 Statement at ¶30.  That letter – a copy of which is attached to the Declaration of Maurizio Savoiardo dated March 12, 2010 (the "Savoiardo Declaration") as Exhibit J – did not reveal the nature of plaintiff's illness.  Rather, it stated that a letter would "be forthcoming to your office from . . . William S. Packard, M.D. detailing [the] ailment."

On January 16, 2002, plaintiff visited Dr. Packard for a second time.  According to Dr. Packard, plaintiff said that he was feeling "much better," that he was sleeping "okay," and that his appetite had improved.  Deposition of Dr. William S. Packard dated May 13, 2005 (the "Packard Dep.") at 15.[2]  Plaintiff also reported that he was "[l]ess nervous overall," although he was still "trying to stay home and be calm."  *Id*.  Dr. Packard observed that plaintiff "look[ed] much less anxious," but also observed that plaintiff exhibited some "fidgeting and restlessness."

---

[1]A copy of the 2004 Petrone Deposition is included in Ex. D to the Declaration of Maurizio Savoiardo dated March 12, 2010.

[2]The Packard Deposition is attached to the Savoiardo Declaration as Exhibit F.

*Id.* The doctor increased plaintiff's daily dose of Paxil from 20 to 30 milligrams, and increased his dose of Xanax from three to four milligrams per day. *Id.* at 15-16.

On January 16, 2002, Dr. Packard penned a four-sentence note addressed "To Whom it Concern." Def. 56.1 Statement at ¶33; Pl. 56.1 Statement at ¶33. That note – a copy of which is attached as Exhibit L to the Savoiardo Declaration – stated that plaintiff had been under Dr. Packard's care since January 9, 2002, and had been diagnosed with GAD and PD. *Id.*; Savoiardo Declaration, Ex. L. The note further stated that plaintiff was being treated with Paxil and Xanax and was "currently unable to work." *Id.* While the note stated that plaintiff had another visit scheduled for January 29, 2002, Savoiardo Declaration, Ex. L, it offered no estimate of when, if ever, plaintiff could return to work. Def. 56.1 Statement at ¶34; Pl. 56.1 Statement at ¶34. Nevertheless, the District granted plaintiff's request for ten additional sick days on January 16, 2002. Def. 56.1 Statement at ¶31; Pl. 56.1 Statement at ¶31.

On January 22, 2002, McKenna called Dr. Packard to ask when plaintiff would be able to return to work. Def. 56.1 Statement at ¶36; Pl. 56.1 Statement at ¶36. Dr. Packard was unable to provide an "anticipated timetable for plaintiff's return," telling McKenna it was "too early to tell." Def. 56.1 Statement at ¶¶37, 39; Pl. 56.1 Statement at ¶¶37, 39. The District never received any further information from Dr. Packard. Def. 56.1 Statement at ¶38; Pl. 56.1 Statement at ¶38.

In late January/early February 2002, McAleese – then the principal of the secondary school – attempted to contact plaintiff on multiple occasions to inquire about his condition. Def. 56.1 Statement at ¶42; Pl. 56.1 Statement at ¶42. McAleese was not only concerned about plaintiff, but was concerned about the impact that the "lack of continuity in the classroom" might have on plaintiff's students' performance on their Regent's examinations. Def. 56.1 Statement at

¶43; Pl. 56.1 Statement at ¶43. Plaintiff claims that he made "several attempts" to telephone McAleese and that his telephone records indicate that he attempted to call McAleese three times in January 2002: on January 7, 14 and 24, 2002. Petrone Aff. at ¶¶34-35.

Although plaintiff may have attempted to telephone McAleese on three occasions, he spoke with McAleese only once. Def. 56.1 Statement at ¶44; Pl. 56.1 Statement at ¶44. By the time of his December 2004 deposition, plaintiff could not recall the exact date on which the conversation took place, but believed that it was within two weeks of his January 11, 2002, letter requesting ten additional days of sick leave. 2004 Petrone Dep. at 116. A record of calls placed from plaintiff's cell phone – the only phone he had at that time – indicates that plaintiff placed a call to McAleese's personal office telephone on January 24, 2002. *Id*. at 136; Petrone Aff. at ¶35.

According to plaintiff's own account of that telephone conversation, plaintiff was unable to give McAleese a specific date on which he would be able to return. 2004 Petrone Dep. at 119. Rather, plaintiff believes that he gave McAleese "a general range of time," telling him "it would be between a few and several weeks." *Id*. at 120-21. McAleese told plaintiff to notify him as soon as he was ready to return to work, and plaintiff agreed to do so. *Id*. at 121.

By all accounts, McAleese and plaintiff never spoke thereafter. Although plaintiff alleges, and plaintiff's telephone records reflect, that he called McAleese's office on February 5, 2002, Petrone Aff. at ¶35, 2004 Petrone Dep. at 138, plaintiff concedes that he was unable to reach McAleese on that date. Pl. 56.1 Statement at ¶45. For his part, McAleese claims that he telephoned plaintiff on at least two occasions, but that plaintiff never returned his calls. Deposition of Samuel McAleese dated Jan. 28, 2005 ("McAleese Dep.") at 102, 104-05.[3]

_____

[3] McAleese's deposition is attached as Ex. E to the Savoiardo Declaration.

Plaintiff, apparently unaware of these calls, claims that McAleese made no further efforts to contact him.  Petrone Aff. at ¶38.

During his January 29, 2002, visit to Dr. Packard, plaintiff reported feeling "substantially better."  Packard Dep. at 23.  Although plaintiff told Dr. Packard that he did not feel "totally himself" and was still experiencing some anxiety and insomnia, he was no longer having full-blown panic attacks.  *Id*.  Nevertheless, plaintiff expressed a reluctance to return to work, telling Dr. Packard that he was "not sure if he want[ed] to continue to be a teacher or if it . . . [was] the school that . . . [was] the problem." *Id*. at 24.

On his February 5, 2002, visit to Dr. Packard, plaintiff reported "feeling better overall." Packard Dep. at 25.  He was still experiencing "anxiety symptoms," but reported no trouble sleeping or eating.  *Id*.  Plaintiff told Dr. Packard he felt strange about not working, and that there were "some jobs here he [could] have," but that he was not "sure what he want[ed] to do." *Id*.  Plaintiff also announced that he was "going to [the] Florida Keys with friends to go fishing for a week in two weeks." *Id*.

On February 8, 2002, McKenna sent plaintiff a three-paragraph letter which, in part, scolded plaintiff for not returning the District's telephone calls.  That letter – a copy of which is attached to the Savoiardo Declaration as Exhibit M – began:

> Your building principal, Sam McAleese, advised me that you have not been returning his phone calls.  It is critical that we know the periods of time for which you will be unable to perform the duties of your job as a Social Studies teacher in the school district.  It is imperative that your doctor inform us of his prognosis as to when you will be able to return to work.  As you must understand, continuity of instruction with the same teacher is of great importance regarding the academic success of our students.

The remaining two paragraphs of McKenna's letter proposed two possible accommodations, stating:

> If you are unable to return to work within a short period of time, I would like to offer you the opportunity for a fixed term leave of absence without pay through the end of the school year. That way, we should be able to provide your students with continuity of instruction for that fixed term of time. You are hereby directed to call me regarding your interest in an agreed upon fixed term leave of absence.
>
> At the current time, it is our intention to ask the Board of Education at their Regular meeting on Tuesday, February 12, 2002 to designate your absence from work as Family and Medical Leave Act leave on an unpaid basis for the period of time commencing February 13, 2002 for a period of up to 12 weeks. During the time of such leave, you will be entitled to all medical benefits as if you were on payroll.

Savoiardo Declaration, Ex. M.

Although plaintiff claims that he called McKenna on February 10, 2002, Petrone Aff. at ¶41 – the day after he receiving McKenna's letter, *id*. at ¶39 – plaintiff does not represent that he ever spoke to McKenna. Rather, plaintiff maintains that McKenna was unavailable when he called, and that he did not call plaintiff back. *Id*. at ¶41. In addition, it is undisputed that plaintiff never provided the prognosis which McKenna had demanded. Def. 56.1 Statement at ¶47; Pl. 56.1 Statement at ¶47.

According to plaintiff, he called the District shortly after the February 12, 2002, School Board meeting to determine what had transpired. Petrone Aff. at ¶43. Plaintiff spoke to a secretary, who informed him that he had been "placed . . . on extended medical leave." *Id.* Notwithstanding the fact that McKenna's letter explicitly stated that McKenna would request that the School Board grant plaintiff a leave of absence of up to 12 weeks, plaintiff apparently believed that he had been placed on leave until the Fall. Def. 56.1 Statement at ¶52; Pl. 56.1 Statement at ¶52. Therefore, plaintiff thought it was no longer necessary to contact McKenna. Petrone Aff. at ¶43.

Although plaintiff was not notified of the School Board's action until March 4, 2002, Savoiardo Declaration, Ex. N, the School Board had actually voted to grant him up to 12 weeks' leave under the Family and Medical Leave Act (the "FMLA"). Def. 56.1 Statement at ¶52; Pl. 56.1 Statement at ¶52. In the process of obtaining the School Board's approval to place plaintiff on FMLA leave, McKenna appeared in an executive session attended only by the Board members and the assistant superintendent, during which he may have informed the Board that he thought plaintiff was having a nervous breakdown. Deposition of J. Bruce McKenna dated May 6, 2005 ("McKenna Dep.") at 44-45, 95.[4] However, at his May 2005 deposition, McKenna did not know whether he had actually used the term, "nervous breakdown," in describing plaintiff's condition. *Id*. at 44.

Sometime in late February 2002, McKenna summoned Lerner and McAleese to a meeting to discuss plaintiff's situation. Petrone Aff. at ¶45. There is conflicting evidence concerning exactly what transpired during that meeting. McKenna claims that Lerner suggested the possibility of resignation, asking McKenna, "How would you like his resignation?" McKenna Dep. at 46. McKenna recalls that he replied, "I'd love it," and that he and Lerner proceeded to negotiate a deal. *Id*. However, Lerner recalls that McKenna and McAleese demanded plaintiff's resignation and threatened to terminate him if he did not do so. Since Lerner's account is more favorable to plaintiff, the following discussion focuses primarily on Lerner's deposition testimony.

According to that testimony, McKenna was upset that plaintiff was not returning McAleese's telephone calls and anxious to hire a full-time replacement for plaintiff rather than a temporary replacement. Deposition of Stephen Lerner dated Mar. 16, 2005 ("Lerner Dep.") at

---

[4]The McKenna Deposition is attached to the Savoiardo Declaration as Ex. G.

16-18.[5]  In addition, McKenna expressed disappointment in plaintiff's performance, saying he thought plaintiff would be a much better teacher than he turned out to be.  *Id*. at 27, 30.  Wanting to work out a deal that would enable plaintiff to leave "on terms that might not be completely unsatisfactory to him," McKenna proposed a deal that would enable plaintiff to continue receiving health benefits and to receive disability benefits for some portion of his leave, rather than no pay at all.  *Id.* at 21, 24-25.  According to Lerner, McKenna "felt a personal level with [plaintiff] and . . . didn't want to hurt him," but also repeatedly stated that plaintiff would be fired if he did not resign.  *Id*. at 29, 30, 35.

Throughout his deposition testimony, Lerner indicated that McKenna's and McAleese's dissatisfaction with plaintiff related primarily to his failure to communicate with them.  For example, Lerner testified that McKenna and McAleese were unwilling to give plaintiff "a second chance . . . [b]ecause . . . they were upset that he wasn't calling back."  *Id.* at 29.  Lerner also testified that McKenna "really had his nose out of joint about the phone calls," *id.* at 123, and that the "riff [*sic*] between Sam McAleese and [plaintiff]" was caused by plaintiff's failure to provide a "target date" for his return.  *Id.* at 101.

According to Lerner, McKenna never "clearly linked" his determination to end plaintiff's employment with the District to plaintiff's medical condition.  *Id*. at 139.  However, McKenna referred to plaintiff as "a nut" at least a "[c]ouple [of] times," and indicated that he did not want to deal with plaintiff's mental health problems.  *Id.* at 77-78, 139.  When Lerner was asked if McAleese ever "discuss[ed] that he wanted to get rid of [plaintiff] because of his medical condition," Lerner testified:

---

[5]The Lerner Deposition is attached to the Declaration of Michelle K. Caldera-Kopf (the "Caldera-Kopf Declaration") as Exs. D and D-2.

> What he was most adamant about was the fact that he was not informed as to whether or not [plaintiff] was coming back on a certain targeted date . . . and that [plaintiff] couldn't even tell him when that would be.  I think [McAleese] felt it was kind of fishy.

*Id*. at 125.

According to plaintiff, Lerner called him the day of his meeting with McKenna and McAleese and said that McKenna and McAleese had demanded his resignation.  Petrone Aff. at ¶¶45-46.  Lerner stated that if plaintiff resigned, he would receive an additional ten paid sick days and "full disability benefits."  *Id.* at ¶46.  If he refused to resign and was terminated, he would not receive any benefits.  *Id.* at ¶47.  However, Lerner himself did not think that plaintiff would be terminated before he returned to school.  As Lerner explained during his deposition, "What would have happened was that if . . . and when John came back he would be observed and would be found wanting in certain areas and, therefore, his days in Hampton Bays would have been numbered."  Lerner Dep. at 167.

By Lerner's account, plaintiff did not make an immediate decision on whether to resign. Lerner and plaintiff had several conversations, during which they discussed the possibility of filing a grievance and the hypothetical question of "What would happen if [he] came back." Lerner Dep. at 47-49.  Lerner advised plaintiff against filing a grievance.  Def. 56.1 Statement at ¶62; Pl. 56.1 Statement at ¶62.  However, plaintiff also consulted a field representative of the New York State United Teachers union, who "reaffirmed" that, "as a nontenured person," he would not "have much in the way of legal recourse."  Lerner Dep. at 51.

According to Lerner's testimony, plaintiff then negotiated with the District.  Lerner suggested that plaintiff "not accept or resign, unless he got something more than he was originally promised."  Lerner Dep. at 137.  Plaintiff followed Lerner's suggestion and Lerner

"went back with that at his request," prompting the District to offer an extension of health insurance benefits through September 2002. *Id.*

On March 4, 2002, after consulting with one of his professors and taking "a few days . . . to make up his mind," *id*. at 147, plaintiff resigned. Plaintiff claims that he did not want to do so, but felt he had no choice because HBUFSD "intended on terminating [him] regardless." Petrone Aff. at ¶49. In light of these circumstances, plaintiff "thought it best that [he] resign and obtain the benefits promised." *Id*. at ¶48. However, it is undisputed that plaintiff never spoke directly with McKenna, McAleese or any other District administrator concerning his resignation. Def. 56.1 Statement at ¶60; Pl. 56.1 Statement at ¶60. Accordingly, plaintiff's belief that he was forced to resign by defendants is based solely on his discussions with Lerner. Def. 56.1 Statement at ¶61; Def. 56.1 Statement at ¶61.

Plaintiff memorialized his understanding of the District's offer in his resignation letter to McKenna, which he drafted with Lerner's assistance. Pl. 56.1 Statement at ¶¶55, 59; Def. 56.1 Statement at ¶¶55, 59. That three-paragraph letter – a copy of which is attached to the Savoiardo Declaration as Exhibit O – begins:

> After discussions with my union representative I understand that you have agreed to issue me fifteen additional paid days (up to and including winter break, February 5-February 25, 2002). I have also been informed that I will be receiving disability benefits in accordance with the district's disability insurance policy effective the second week of March (completion of 60 day wait period). In addition I understand I will receive my full medical benefits until September 01, 2002, after that date I will be entitled to an additional 18 months of medical coverage under the COBRA law. I also understand under the COBRA law that I must begin my own medical contributions as of September 02, 2002.

Savoiardo Declaration, Ex. O. Plaintiff now admits that the reference to "fifteen additional paid days" was erroneous, in that the District had offered only ten additional days. Def. 56.1

Statement at ¶58; Pl. 56.1 Statement at ¶58. Plaintiff attributes the error to a miscommunication between him and Lerner. *Id.*

The remaining two paragraphs of plaintiff's letter made no allusions to coercion. Rather, that letter states, in pertinent part:

> As a result of my illness, and the unknown prognosis of a specific recovery date, I must resign . . . effective September 01, 2002. It is with great regret that I offer my resignation. It is my sincere hope that with my current course of medical treatment, I will be able to return to the educational field in the near future.
>
> I thank you and the Board of Education for your understanding during this very difficult time in my life. I sincerely regret the inconvenience my unexpected illness has caused the district. I also would like to express my sincere apologies . . . .

Savoiardo Declaration, Ex. O. Plaintiff now claims that these statements "did not accurately reflect" his medical condition and his ability to teach at the time; that he "felt healthy enough to return to work right around the time that [he] was forced to resign;" and that he drafted these paragraphs "to comply with . . . Lerner's indication that [his] resignation letter must appear to be voluntary." Petrone Aff. at ¶¶52, 59. Lerner admits that he spoke to plaintiff about how he should draft his letter to McKenna, but denies that he ever told plaintiff that the District wanted the letter to appear voluntary. Lerner Dep. at 58. However, for purposes of the summary judgment motion, this Court must accept plaintiff's version of this conversation as true.

On March 4, 2002 – the same day that the District received plaintiff's resignation letter – plaintiff wrote a letter to McAleese, his former principal. Def. 56.1 Statement at ¶64; Pl. 56.1 Statement at ¶ 64. That one-page letter – a copy of which is attached as Exhibit P to the Savoiardo Declaration – begins by attempting to "clear up any misunderstandings you may have due to the perception of lack of information I have provided you." Savoiardo Declaration, Ex. P. The letter then states:

> [D]uring our last phone conversation you had asked me to inform
> you as soon as I knew when I could return to work. Since my
> physician to this day cannot provide me with that information, I
> was not able to even guess as to when I could return.

*Id*. After describing his ailments – his GAD and PD, as well as an intestinal fissure – plaintiff

concludes the letter by writing:

> I decided along with consulting with Steve Lerner that getting
> healthy should be my top priority. Despite my misgivings about
> resigning from teaching in my first year, I felt that I would not be
> able to give the kids my best effort in educating while
> simultaneously battling these ailments. I sincerely hope you
> understand my position.

*Id*.

In March 2002, McKenna appeared before the School Board in connection with

plaintiff's resignation. McKenna recalled describing plaintiff's condition by saying something to

the effect of: "he's had a tough time, a mental breakdown or whatever, he just can't come to

work." McKenna Dep. at 68. In addition, McKenna told the School Board that plaintiff was a

"lousy teacher," and that his resignation resulted in "no great instructional loss." McKenna Dep.

at 71-72. According to McKenna, all of these comments were made during the "executive

session" – a private meeting between the superintendent and the five-member board conducted

prior to the public School Board meeting. *Id*. at 71. However, Lerner testified at his deposition

that McKenna also called plaintiff a "lousy teacher" during the meeting at which McKenna and

McAleese demanded plaintiff's resignation, saying that he "should never have been hired."

Lerner Dep. at 146.

On March 19, 2002, the School Board voted to accept plaintiff's resignation. Def. 56.1

Statement at ¶66; Pl. 56.1 Statement at ¶66. According to a copy of the Board resolution, which

is attached as Exhibit Q to the Savoiardo Declaration, plaintiff was granted ten days of additional

sick leave, which covered the period between February 5 and 25, 2002, and the start of his FMLA leave was pushed back two weeks to February 26, 2002.   Savoiardo Declaration, Ex. Q. The determination as to whether to grant plaintiff disability benefits, however, rested not with the School Board, but with the District's disability carrier.  Def. 56.1 Statement at ¶71; Pl. 56.1 Statement at ¶71.  According to Lerner, "everybody" expected that he would be placed on disability.  Lerner Dep. at 59.  Nonetheless, the carrier denied plaintiff's disability claim on the ground that he had a pre-existing condition.  Def. 56.1 Statement at ¶72; Pl. 56.1 Statement at ¶72.

On July 22, 2002, plaintiff wrote a letter to the District in an attempt to rescind his resignation.  Def. 56.1 Statement at ¶73; Pl. 56.1 Statement at ¶73.  That letter – a copy of which is attached to the Savoiardo Declaration as Exhibit T – was addressed to Diane Albano, the District Clerk who had mailed him a copy of the Board resolution accepting his resignation, and stated only, " I hereby rescind my resignation letter of intent that was to be effective by 09/01/2002."  Savoiardo Declaration, Ex. T.  The District did not permit plaintiff to rescind his resignation.  Def. 56.1 Statement at ¶74; Pl. 56.1 Statement at ¶74.

***The Charges of Discrimination***

On or about August 13, 2002, plaintiff filed a complaint with the New York State Division of Human Rights (the "SDHR").  Def. 56.1 Statement at ¶75; Pl. 56.1 Statement at ¶75.  In that complaint – a copy of which is attached to the Savoiardo Declaration as Exhibit U – plaintiff alleged that his GAD was "an impairment which is a disability within the meaning of the New York State Human Rights Law," and that he informed Cahill that he was "initiating disability leave and benefits" in early January 2002.  Savoiardo Declaration, Ex. U, at ¶¶1, 3. Plaintiff further alleged that in February 2002, Lerner had informed him that McKenna and

McAleese "wanted [him] to resign because of the type of illness [he] had." *Id*. at ¶5. Plaintiff stated that he resigned his position "effective September 1, 2002;" attempted to rescind his resignation on July 22, 2002; but received a letter dated July 25, 2002, in which McKenna stated that he "saw no valid reason to rescind [the] resignation." *Id*. at ¶7. Based on these allegations, plaintiff charged the District with discriminating against him on account of his disability "by forcing [his] resignation, failing to reinstate [him] and failing to pay . . . disability benefits" and "by refusing to give [him his] job back." *Id*. at ¶¶8, 9.

### The Complaint and Amended Complaint

In September 2003, plaintiff commenced this action against the District, McKenna, McAleese, and a single "Doe" defendant, alleging, *inter alia*, that the District discriminated against him on the basis of his mental illness, that McKenna and McAleese "violated [his] liberty interest in his good name and reputation," and that McKenna and McAleese slandered him by falsely reporting that he had suffered a nervous breakdown and no longer wanted to teach his students. That pleading was amended in May 2004, and defendants subsequently moved for summary judgment on that first amended complaint. Plaintiff cross-moved to amend the complaint.

In a Memorandum and Order dated September 9, 2009, and filed September 10, 2009, this Court granted plaintiff's motion to amend his pleading and deemed the summary judgment motion withdrawn. That Memorandum and Order provided that defendants, upon reviewing the amended complaint, could either renew their motion for summary judgment or amend their motion papers. In addition, the Memorandum and Order directed the parties to "confer with each other with regard to whether the [ADA Amendments Act of 2008, 122 Stat. 3553 (the "ADAAA"),] applies retroactively," and to advise the Court "whether supplemental briefing on

the effect (or lack of effect) of the ADAAA is necessary." *Petrone v. Hampton Bays Union Free Sch. Dist.*, No. 03-CV-4359 (SLT)(ARL), 2009 WL 2905778, at *19 (E.D.N.Y. Sept. 10, 2009).

### The Second Amended Complaint

On October 5, 2009, plaintiff filed his Second Amended Complaint. That pleading advances ten causes of action, the first five of which allege violations of section 504 of the Rehabilitation Act ("§504") and/or Title I of the ADA ("Title I"). The first and second causes of action allege that defendant HBUFSD violated Title I and §504, respectively, by forcing plaintiff to resign his position after learning that plaintiff suffered from GAD and PD. The third and fourth causes of action allege that defendant HBUFSD violated Title I and §504, respectively, by failing to provide plaintiff with a reasonable accommodation that would have enabled him to continue teaching. The fifth cause of action alleges that defendant HBUFSD violated Title I by failing to engage plaintiff "in an interactive process that would have facilitated the provision of a reasonable accommodation." 2d Am. Complt. at ¶ 53.

The sixth and seventh causes of action are procedural due process claims brought against defendant McKenna pursuant to 42 U.S.C. § 1983 ("§1983"). The sixth cause of action alleges that McKenna violated plaintiff's "liberty interest in his good name and reputation" by telling member of the HBUFSD School Board and unspecified "others" that plaintiff "suffered a 'nervous breakdown' and quit" and "was 'a lousy teacher' who should 'never have been hired.'" *Id*. at ¶55. The seventh cause of action alleges that these exact same actions violated plaintiff's "liberty interest in his reputation for professional competence." *Id*. at ¶57.

The remaining three causes of action raise pendent state claims. The eighth cause of action alleges that defendant HBUFSD violated New York State Executive Law §296(1)(a) by forcing plaintiff to resign after learning that plaintiff suffered from GAD and PD. The ninth

cause of action alleges that HBUFSD breached its contract with plaintiff by failing to provide disability benefits through September 1, 2002. Finally, the tenth cause of action alleges that defendants McKenna and HBUFSD slandered plaintiff by informing members of the School Board that plaintiff "suffered a 'nervous breakdown' and quit" and "was 'a lousy teacher' who should 'never have been hired.'" *Id.* at ¶63.

In a letter dated October 23, 2009, defendants' counsel informed this Court that the parties agreed that the ADAAA does not apply retroactively. *See* Letter to Hon. Sandra L. Townes from Michael A. Miranda and Matthew J. Mehnert dated Oct. 23, 2009, at 1. Defendants' counsel elected not to merely renew the motion for summary judgment, but requested permission to conduct additional discovery. That request was referred to Magistrate Judge Lindsay, who granted the request. In early 2010, following the completion of that discovery, defendants requested, and were granted, permission to file a second motion for summary judgment.

### *Defendants' Motion for Summary Judgment*

In November 2010, defendants' filed the instant motion for summary judgment. Defendant's Memorandum of Law in Support of the Motion ("Defendants' Memo") raises seven points, the first three of which relate to plaintiff's federal claims and the last four of which relate to plaintiff's state law claims. The discussion below focuses primarily on the first two points, the first of which raises five separate arguments and the second of which raises three separate arguments.

In their first point, defendants seek summary judgment with respect to the first five causes of action on the ground that plaintiff does not qualify for protection under the ADA. The first two arguments contained in this point relate to all six of these causes of action. In the first

argument, defendants assert that plaintiff is not disabled because he is not impaired in the major life activities of working or sleeping and has not demonstrated any social limitations. In the second argument, defendants assert that plaintiff cannot make out a *prima facie* case under the ADA because plaintiff cannot establish that he was a qualified individual.

The third argument raised in the first point seeks to dismiss the third and fourth causes of action on the grounds that plaintiff never sought a reasonable accommodation and that no such accommodation was possible. The fourth argument seeks to dismiss the fifth cause of action, asserting that defendants were not required to engage in any "interactive process" because plaintiff never requested any accommodations. The fifth argument relates to the first and second causes of action, arguing that plaintiff did not suffer an adverse employment action, but voluntarily resigned his position.

Defendants' second point advances three arguments for summary judgment with respect to plaintiff's sixth and seventh causes of action, both of which raise "stigma-plus" claims. In the first of these arguments, defendants assert that summary judgment should be granted as to both the sixth and seventh causes of action because plaintiff cannot prove that the allegedly stigmatizing claims were made public or disseminated because the statements at issue were made during a closed-door "executive session." In the second argument, defendants argue for summary judgment on the seventh cause of action, asserting that plaintiff (1) cannot establish that he was unable to find other government employment as a result of the failure to have a name-clearing hearing and (2) subsequently secured other government employment despite the absence of such a hearing. In the third argument, defendants argue that both stigma-plus claims must be dismissed because McKenna's claims were statements of opinion, incapable of being

proved false, and were not so derogatory as to damage plaintiff's personal or professional reputation.

The five other points raised in Defendants' Memo do not require extensive discussion. In the third point, defendants argue that McKenna is not subject to personal liability under the ADA. The fourth point seeks summary judgment with respect to the ninth and tenth causes of action, arguing that plaintiff did not file a notice of claim with respect to the breach of contract and slander claims. The fifth point seeks summary judgment with respect to the ninth cause of action, arguing that defendants' disability insurer was solely responsible for the decision to deny plaintiff disability benefits. In the sixth point, defendants argue for summary judgment with respect to the tenth cause of action, asserting (1) that McKenna's comments were merely opinions, (2) that his statements were privileged because they were made to school officials and related to an employee and (3) that plaintiff cannot prove falsity or malice. Finally, in the seventh point, defendants argue that if this Court dismisses all federal claims, it should not exercise pendant jurisdiction over the state-law claims.

***Plaintiff's Opposition***

Plaintiff's Memorandum of Law in Opposition to Defendants' Motion for Summary Judgment ("Plaintiff's Opposition") addresses most, but not all of defendants' arguments. Since McKenna is not named as a defendant in the first five causes of action – the only causes of action alleging violations of the ADA – Plaintiff's Opposition does not address the third point in Defendants' Memo – *i.e*., the argument that McKenna cannot be personally liable under the ADA. In addition, Plaintiff's Opposition devotes less than a page to arguing that plaintiff is disabled. Instead, plaintiff primarily argues that HBUFSD regarded him as disabled.

Notwithstanding the emphasis on the "regarded as disabled" argument, plaintiff's opposition papers include several pieces of evidence relating to plaintiff's disability. First, plaintiff has provided the Court with an affidavit executed on June 23, 2006, by Dr. Roy Lubit, an expert in psychiatry (the "Lubit Aff.").[6] In that affidavit, Dr. Lubit states that plaintiff suffers from GAD and PD, both of which are "recognized mental illnesses within the psychiatric community." Lubit Aff. at ¶3. The doctor notes that "trouble sleeping" is a symptom of these conditions, and that plaintiff exhibited this symptom from October 2001 to January 2002. *Id.* at ¶¶4-5.

Dr. Lubit further notes that, in January 2002, plaintiff was prescribed Paxil and Xanax, two "commonly prescribed medications" for the treatment of GAD and PD. *Id.* at ¶10. These medications alleviate the symptoms of these conditions, including the insomnia, by reducing the patient's anxiety. *Id.* at ¶11. However, Paxil normally requires 3 to 8 weeks to take effect. *Id.* at ¶¶11-12.

Dr. Lubit claims that, even with the medication, it is "extremely likely" that plaintiff's symptoms "will manifest themselves anyway." *Id.* at ¶22. According to Dr. Lubit, such symptoms "can include difficulty sleeping for periods of time from weeks to months." *Id.* In addition, because these medications are either addictive or have side-effects, it is "advisable psychiatric practice to discontinue the medication for a period of time." *Id.* at ¶¶15-17. At these times, it is "highly likely that eventually the symptoms of anxiety" will recur, at which point "the treating psychiatrist will then place the patient back on a medication regime." *Id.* at ¶19. Accordingly, even with proper psychiatric care, plaintiff's symptoms can be expected to "wax

---

[6]This affidavit is attached to the Caldera-Kopf Declaration as Exhibit B.

and wane" throughout his life, with the symptoms recurring "on multiple occasions."  *Id.* at ¶¶20, 23.

Plaintiff has also provided the deposition of one Gregory Metzger – a teacher in Southampton, New York, and a personal friend of plaintiff – in support of his stigma-plus claims.  At his January 25, 2010, deposition, Metzger offered a detailed description of the hiring process in New York school districts.  Metzger testified that "usually the administrator – either the principal and or the superintendent [–] may call some of your references."  Deposition of Gregory Metzger (the "Metzger Dep.") at 41.[7]  However, Metzger claimed that if an applicant "came from a different district, they will call that principal or superintendent."  *Id.*

Metzger admitted that his understanding of the process was based on his own experiences in the Southampton School District.  *Id.* at 19, 40.  Metzger testified that he had never been part of the hiring process even at his own high school, other than to provide feedback regarding a some demonstration lessons given by applicants.  *Id.* at 42.   Rather, Metzger claimed that he learned of the hiring process "[f]rom being a teacher for nine years in a district and seeing lots of teachers come and go."  *Id.* at 50.

Plaintiff has also provided this Court with his own affidavit dated March 18, 2010 – the Petrone Aff. – in which plaintiff updates the Court on developments since September 2009. Plaintiff states that he is now taking Lexapro and Clonazepam and has discontinued his use of Paxil.  Petrone Aff. at ¶¶68-69.  Although plaintiff claims that he suffers various side-effects and notes that Dr. Lubit states that, "during periods of [his] life[, he] may have to cease taking medication for a period of time," *id.* at ¶71, plaintiff does not state that his treating psychiatrists have ever discontinued his medications.  To the contrary, plaintiff mentions only one instance in

---

[7]The Metzger Deposition is attached as Ex. G to the Caldera-Kopf Declaration.

which he discontinued the medications – an instance just after he moved from New York to California in 2004 in which he had difficulty obtaining a prescription. *Id*. at ¶72. On that occasion, during which plaintiff went three weeks without medication, his symptoms recurred. *Id*. at ¶73. According to plaintiff, by the end of the three-week period, he was sleeping only one hour per night. *Id.* at ¶74.

Notwithstanding his medical conditions, plaintiff was hired as a teacher by the Gustine, California, school district in June 2004 and has been employed there ever since. Plaintiff admits that he did not seek any teaching jobs in New York after he left HBUFSD. *Id*. at ¶64. Plaintiff states that it is his "understanding, based on conversations with educational professors and other teachers," that "the educational community in New York is 'tight knit.'" *Id*. Accordingly, the "circumstances surrounding [his] forced resignation from the HBUFSD would have been communicated to any district [that he] may have applied to in the state," which "would have thwarted any opportunity . . . to obtain another teaching position . . . ." *Id*.

Plaintiff did, however, apply for "several other teaching positions in states outside of New York . . . ." *Id.* at ¶77(2).[8] In connection with those applications, plaintiff provided contact information for the HBUFSD when requested. *Id.* Plaintiff did not receive any offers, but was not given a specific reason for these school districts' decisions not to hire him. *Id*. In applying for the job in Gustine, plaintiff provided recommendations from Lerner and Frances Stefanek, his mentor and department head at HBUFSD. *Id*. at ¶77(1). Plaintiff listed HBUFSD as a former employer in his resume, but "did not provide general contact information for any other [HBUFSD] officials as personal references because [he] was concerned that Dr. McKenna's negative opinions . . . would be communicated to the hiring officials . . . ." *Id.*

---

[8]The Petrone Affidavit includes two paragraphs numbered 77. The first will be referred to as ¶77(1), and the second, as ¶77(2).

In May 2008, plaintiff was named Gustine High School Teacher of the Year. *Id.* at ¶78. The next month, he was named the Assistant Principal of the high school. *Id.* at ¶79. Although plaintiff was still working in that capacity in March 2010, he was also named the Principal of Gustine's Pioneer Continuation School in June 2009. *Id.* at ¶80. Plaintiff does not allege that his medical conditions have ever impeded his ability to perform as a teacher, as an Assistant Principal or in his dual role as both Assistant Principal of the high school and Principal of another school.

## *DISCUSSION*

### *I. Summary Judgment Standard*

Summary judgment is appropriate only when "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); *see Celotex v. Catrett*, 477 U.S. 317, 322 (1986). "[G]enuineness runs to whether disputed factual issues can reasonably be resolved in favor of either party, [while] materiality runs to whether the dispute matters, *i.e.*, whether it concerns facts that can affect the outcome under the applicable substantive law." *Mitchell v. Washingtonville Cent. Sch. Dist.*, 190 F.3d 1, 5 (2d Cir.1999) (internal quotation marks omitted).

The moving party bears the burden of showing that there is no genuine issue of fact. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986). If the movant meets this burden, the non-movant "must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e)*; see Western World Ins. Co. v. Stack Oil, Inc.*, 922 F.2d 118, 121 (2d Cir. 1990). The non-movant cannot avoid summary judgment "through mere speculation or conjecture" or "by vaguely asserting the existence of some unspecified disputed material facts." *Western World*, 922 F.2d at 121 (internal quotations and citations omitted). Moreover, the disputed facts

must be material to the issue in the case, in that they "might affect the outcome of the suit under the governing law." *Anderson*, 477 U.S. at 248.

When evaluating a motion for summary judgment, "[t]he court must view the evidence in the light most favorable to the party against whom summary judgment is sought and must draw all reasonable inferences in his favor." *L.B. Foster Co. v. Am. Piles, Inc.*, 138 F.3d 81, 87 (2d Cir. 1998) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)). "No genuine issue exists if, on the basis of all the pleadings, affidavits and other papers on file, and after drawing all inferences and resolving all ambiguities in favor of the non-movant, it appears that the evidence supporting the non-movant's case is so scant that a rational jury could not find in its favor." *Chertkova v. Conn. Gen. Life Ins. Co.*, 92 F.3d 81, 86 (2d Cir. 1996). "If the evidence [presented by the non-moving party] is merely colorable, or is not significantly probative, summary judgment may be granted." *Scotto v. Almenas*, 143 F.3d 105, 114 (2d Cir. 1998) (internal quotation marks omitted) (alteration in original).

## II. Plaintiff's ADA and Rehabilitation Act Claims

As noted above on page 17, *ante*, plaintiff's Second Amended Complaint advances three claims under the ADA. The first cause of action alleges that HBUFSD, by forcing plaintiff to resign after learning that he suffered from GAD and PD, engaged in disability discrimination in violation of 42 U.S.C. §12112(a). The third cause of action in plaintiff's Second Amended Complaint alleges that HBUFSD engaged in a specific type of discrimination: failing to reasonably accommodate plaintiff's disability in violation of 42 U.S.C. §12112(b)(5)(A). Plaintiff's fifth cause of action alleges that HBUFSD failed to "engage [plaintiff] in an interactive process that would have facilitated the provision of a reasonable accommodation. . . ." Plaintiff's second and fourth causes of action both allege violations of section 504 of the

Rehabilitation Act, 29 U.S.C. § 794(a), which provides that "[n]o otherwise qualified individual with a disability in the United States . . . shall, solely by reason of her or his disability, . . . be subjected to discrimination under any program or activity receiving Federal financial assistance . . . ." The second cause of action is based on the same disability discrimination that forms the basis for the first cause of action, while the fourth cause of action is based on the reasonable-accommodation violation that forms the basis for the third cause of action.

Claims of discrimination under the ADA and the Rehabilitation Act are analyzed under the burden-shifting analysis established for employment discrimination cases under Title VII of the Civil Rights Act of 1964 in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  *See Reg'l Econ. Cmty. Action Program, Inc. v. City of Middletown*, 294 F.3d 35, 48-49 (2d Cir. 2002).  Under *McDonnell Douglas*:

> [P]laintiff bears the initial burden of proving by a preponderance of the evidence a prima facie case of discrimination.  The burden of production then shifts to defendants, who must offer through the introduction of admissible evidence a non-discriminatory reason for their actions that, if believed by the trier of fact, would support a finding that unlawful discrimination was not a cause of the disputed employment action.  Plaintiff then must show that the proffered reason was merely a pretext for discrimination, which may be demonstrated either by the presentation of additional evidence showing that the employer's proffered explanation is unworthy of credence, or by reliance on the evidence comprising the prima facie case, without more.

*Heyman* v. *Queens Vill. Comm. for Mental Health for Jamaica Cmty. Adolescent Program, Inc.*, 198 F.3d 68, 72 (2d Cir. 1999) (internal quotations and citations omitted).

The elements of a *prima facie* case differ depending on the type of claim alleged. Plaintiff's first cause of action alleges disability discrimination in violation of 42 U.S.C. § 12112(a), which provides that "[n]o covered entity shall discriminate against a qualified individual on the basis of disability in regard to job application procedures, the hiring,

advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment."  To establish a *prima facie* case of disability discrimination under the ADA, a plaintiff must show:

> (1) his employer is subject to the ADA; (2) he was disabled within the meaning of the ADA; (3) he was otherwise qualified to perform the essential functions of his job, with or without reasonable accommodation; and (4) he suffered [an] adverse employment action because of his disability.

*Cameron v. Cmty. Aid for Retarded Children, Inc.*, 335 F.3d 60, 63 (2d Cir. 2003) (quoting *Giordano v. City of New York*, 274 F.3d 740, 747 (2d Cir. 2001).

The third cause of action in plaintiff's Second Amended Complaint alleges that HBUFSD engaged in disability discrimination by failing to reasonably accommodate plaintiff's disability in violation of 42 U.S.C. §12112(b)(5)(A).  Section 12112(b) lists certain acts which "discriminate against a qualified individual on the basis of disability" in violation of § 12112(a), which include "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee, unless such covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of the business of such covered entity."  42 U.S.C. § 12112(b)(5)(A).  A plaintiff makes out a *prima facie* case of disability discrimination arising from a failure to accommodate by establishing each of the following four elements:

> (1) [P]laintiff is a person with a disability under the meaning of the ADA; (2) an employer covered by the statute had notice of his disability; (3) with reasonable accommodation, plaintiff could perform the essential functions of the job at issue; and (4) the employer has refused to make such accommodations.

*McBride v. BIC Consumer Prods. Mfg. Co., Inc.*, 583 F.3d 92, 96-97 (2d Cir. 2009) (quoting *Graves v. Finch Pruyn & Co., Inc.*, 457 F.3d 181, 184 (2d Cir. 2006)).

The first two of the five arguments contained in the first point in Defendants' Memo contend that plaintiff has failed to make out a *prima facie* case under either of the two standards listed above. In the first argument, defendants argue that plaintiff is not "disabled" as that term is defined for purposes of the ADA. In the second argument, defendants argue that plaintiff is not a "qualified individual" – that is, "an individual who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds . . . ." 42 U.S.C. § 12111(8).

The next two of the five arguments relate to plaintiff's reasonable accommodation claim and to plaintiff's fifth cause of action, which alleges that HBUFSD failed to engage plaintiff in the interactive process envision by the ADA that would have facilitated the provision of a reasonable accommodation. In the third argument, defendants argue that defendants did not identify a reasonable accommodation that would have permitted plaintiff to return to work. In the fourth argument, defendants contend that HBUFSD was not obligated to engage in an interactive process to determine a reasonable accommodation, since that process is triggered by plaintiff's request. Defendants' fifth argument relates solely to the disability discrimination claims contained in plaintiff's first cause of action, asserting that plaintiff never suffered an "adverse employment action" because of his disability.

In addressing these arguments, this Court will apply the version of the ADA which existed prior to January 1, 2009. Congress amended the ADA in 2008, legislatively overturning Supreme Court cases which Congress characterized as having "narrowed the broad scope of protection intended to be afforded by the ADA, thus eliminating protection for many individuals whom Congress intended to protect." *See* Pub. L. No. 110-325, 122 Stat. 3553, at § 2(a)(4) (Sept. 25, 2008). The parties agree that this amendment – the ADA Amendments Act of 2008

("ADAAA") – became effective on January 1, 2009, and is not retroactive. *See* Letter to Hon. Sandra L. Townes from Michael A. Miranda and Matthew J. Mehnert dated Oct. 23, 2009, at 1.[9]

## A. Disability

In the first argument in the first point of Defendants' Memo, defendants contend that plaintiff cannot state a claim under the ADA because he is not "disabled" for purposes of that statute. Prior to January 1, 2009, 42 U.S.C. § 12102(2) defined disability as: "(A) a physical or mental impairment that substantially limits one or more major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment." The ADA itself did not define the terms contained in this definition, and did not delegate to any agency the authority to interpret the term "disability." *Sutton v. United Air Lines, Inc*., 527 U.S. 471, 479 (1999). However, there were "two potential sources of guidance for interpreting the terms in this definition: the regulations interpreting the Rehabilitation Act . . . and the EEOC

_____

[9]Although the Second Circuit has yet to rule on the ADAAA's retroactivity in a published opinion, several unpublished opinions of that Court have implied that the ADAAA is not retroactive by applying the version of the statute that was in effect during the time period at issue. *See Price v. Mount Sinai Hosp.*, 458 Fed. Appx. 49, 50 (2d Cir. 2012) (summary order) *Ragusa v. Malverne Union Free Sch. Dist.*, 381 Fed. Appx. 85, 87 n. 2 (2d Cir. 2010) (summary order); *Cody v. County of Nassau*, 345 Fed. Appx. 717, 718 (2d Cir. 2009) (summary order). These Second Circuit decisions are consistent with reported decisions from sister circuits which have held that the ADAAA is not retroactive. *See*, *e.g.*, *Brown v. City of Jacksonville*, 711 F.3d 883, 888 n. 6 (8th Cir. 2013); *Milton v. Texas Dep't of Crim. Justice*, 707 F.3d 570, 573 n. 2 (5th Cir. 2013); *Young v. United Parcel Service, Inc.*, 707 F.3d 437, 443 (4th Cir. 2013); *Sanchez v. Vilsack*, 695 F.3d 1174, 1179 n. 3 (10th Cir. 2012); *Kapche v. Holder*, 677 F.3d 454, 461 n. 7 (D.C. Cir. 2012); *Becerril v. Pima County Assessor's Office*, 587 F.3d 1162, 1164 (9th Cir. 2009); *Thornton v. United Parcel Serv., Inc.*, 587 F.3d 27, 34 n. 3 (1st Cir. 2009); *Fredricksen v. United Parcel Serv. Co.*, 581 F.3d 516, 521 n. 1 (7th Cir. 2009). In addition, district courts within this Second Circuit have regularly held that the ADAAA is not retroactive. *See, e.g., Widomski v. State University of New York (SUNY) at Orange*, --- F. Supp. 2d ----, 2013 WL 1155439, at *7 (S.D.N.Y. Mar. 20, 2013) (collecting cases); *Villanti*, 733 F. Supp. 2d at 377 (collecting cases); *Primmer v. CBS Studios, Inc.*, 667 F. Supp. 2d 248, 257 n. 5 (S.D.N.Y. 2009) ("all courts, in this Circuit and elsewhere, that have addressed the question of whether the ADAAA applies retroactively to claims filed before its effective date have answered in the negative").

regulations interpreting the ADA." *Toyota Motor Mfg., Ky., Inc. v. Williams*, 534 U.S. 184, 193 (2002), Congress endorsed the use of the Rehabilitation Act regulations by adopting a specific statutory provision stating

> Except as otherwise provided in this chapter, nothing in this chapter shall be construed to apply a lesser standard than the standards applied under title V of the Rehabilitation Act of 1973 ... or the regulations issued by Federal agencies pursuant to such title.

42 U.S.C. § 12201(a).

The Rehabilitation Act regulations were issued in 1977 by the Department of Health, Education, and Welfare, the agency which was then responsible for coordinating the implementation and enforcement of § 504 of the Rehabilitation Act. *Toyota Motor Mfg.*, 534 U.S. at 194-95. These regulations defined the term "mental impairment" to mean "any mental or psychological disorder, such as mental retardation, organic brain syndrome, emotional or mental illness, and specific learning disabilities," and the term "major life activities" to include "functions such as caring for one's self, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." 45 C.F.R. § 84.3(j)(2)(i)-(ii). However, these regulations did not define the term "substantially limits." *Toyota Motor Mfg.*, 534 U.S. at 195.

Prior to 2009, the EEOC's regulations defined the terms "mental impairment" and "major life activities" in the same way as the Rehabilitation Act regulations. *See* 29 C.F.R. §§1630.2(h)-(i) (2008). In addition, the EEOC's regulations defined the term "substantially limits" to mean:

> (i) Unable to perform a major life activity that the average person in the general population can perform; or

> (ii) Significantly restricted as to the condition, manner or duration under which an individual can perform a particular major life activity as compared to the condition, manner, or duration under

> which the average person in the general population can perform that same major life activity.

29 C.F.R. §§1630.2(j)(1).  In addition, the EEOC issued "Interpretive Guidance," which provided that "[t]he determination of whether an individual is substantially limited in a major life activity must be made on a case by case basis, without regard to mitigating measures such as medicines, or assistive or prosthetic devices."  29 CFR pt. 1630, App. § 1630.2(j) (1998).

The Supreme Court applied these EEOC's regulations, albeit without reaching the issue of what deference, if any, these regulations were due.  *See Toyota Motor Mfg*., 534 U.S. at 194; *Sutton*, 527 U.S. at 480; *Albertson's, Inc. v. Kirkingburg*, 527 U.S. 555, 563, n. 10 (1999).  In *Sutton*, however, the Supreme Court rejected the EEOC's Interpretive Guidance, finding "the approach adopted by the agency guidelines – that persons are to be evaluated in their hypothetical uncorrected state – " to be "an impermissible interpretation of the ADA."  527 U.S. at 482. The Supreme Court held:

> Looking at the Act as a whole, it is apparent that if a person is taking measures to correct for, or mitigate, a physical or mental impairment, the effects of those measures – both positive and negative – must be taken into account when judging whether that person is "substantially limited" in a major life activity and thus "disabled" under the Act.

*Id.*

*Toyota Motor Mfg., Ky., Inc. v. Williams*, *supra*, further limited the definition of disability.  First, the Supreme Court held that an impairment had to be "permanent or long-term" to be "substantially limit[ing]."  534 U.S. at 196.  Second, the Court held that it was "insufficient for individuals attempting to prove disability status . . . to merely submit evidence of a medical diagnosis of an impairment," stating, "the ADA requires those 'claiming the Act's protection . . . to prove a disability by offering evidence that the extent of the limitation [caused by their

impairment] in terms of their own experience . . . is substantial.'" *Id*. (quoting *Kirkingburg*, 527 U.S. at 567).

### 1. *Substantial Limitations on Major Life Activity*

In this case, plaintiff maintains that he is disabled for purposes of the ADA under both subsections (A) and (C) of the ADA definition of disability – that is, both because he has one or more mental impairments that substantially limit him in major life activities and because the defendants regarded him as having such an impairment. The Supreme Court has articulated a three-part analysis for determining whether a plaintiff has a disability under subsection (A). *See Bragdon v. Abbott*, 524 U.S. 624, 631 (1998). "The first step in the inquiry under subsection (A) requires [the Court] to determine whether [plaintiff's] condition constituted a physical [or mental] impairment." *Id.* at 632. The second step is to "identify the life activity upon which [the plaintiff] relies . . . and determine whether it constitutes a major life activity under the ADA." *Id.* at 631. "The final element of the disability definition in subsection (A) is whether [the plaintiff's] physical impairment was a substantial limit on the major life activity . . . ." *Id*. at 639.

With respect to the first step of this inquiry, there is ample evidence that plaintiff suffers from conditions that constitute mental impairments. Dr. Packard has diagnosed plaintiff with Generalized Anxiety Disorder and Panic Disorder. Both of these conditions have been recognized as constituting impairments under the ADA. *See Reeves v. Johnson Controls World Servs., Inc*., 140 F.3d 144, 150 (2d Cir. 1998) (finding "no reason to question" that a panic disorder is a mental impairment); *Cody v. County of Nassau*, 577 F. Supp. 2d 623, 638 (E.D.N.Y.

2008), *aff'd*, 345 Fed. Appx. 717 (2d Cir. 2009) (recognizing generalized anxiety disorder as an impairment under the ADA).

The second step of the inquiry– *i.e.*, identifying the major life activities which plaintiff alleges have been limited – is complicated by the fact that plaintiff has taken various positions on this issue. As defendants correctly note, Dr. Roy Lubit, plaintiff's expert psychiatric witness, testified at his February 21, 2006, deposition that plaintiff was substantially limited in the major life activities of "sleeping, working and socializing." Defendants' Memo at 4 (citing Deposition of Roy Lubit, M.D., Ph.D., dated Feb. 21, 2006, at 215).[10] However, in her declaration in opposition to defendants' motion, plaintiff's counsel cites to the Lubit Affidavit in asserting that plaintiff "suffers a substantial impairment in the major life activities of working and sleeping." Declaration of Michelle Caldera-Kopf dated Mar. 19, 2010 (the "Caldera-Kopf Declaration") at ¶5. Plaintiff's Opposition makes no mention of working, arguing only that plaintiff suffers a "Significant Impairment in the Ability to Sleep." Plaintiff's Opposition at 11. Since Plaintiff's Opposition makes no attempt to establish a significant impairment in the major life activity of working or socializing, this Court assumes that the only life activity on which plaintiff relies is sleeping.

The undisputed evidence establishes that plaintiff's mental conditions, when treated with medication, do not substantially limit his ability to sleep. Plaintiff developed insomnia in October 2001, after discontinuing the medication which had been prescribed to him by a VA psychiatrist. His insomnia became progressively worse over the next few month. Whereas he had been able to sleep 7 or 8 hours a night prior to October 2001, he was sleeping only about 5

---

[10]This deposition is attached as Exhibit BB to the Supplemental Declaration of Maurizio Savoiardo dated June 30, 2010.

hours a night by early October, only 3 to 4 hours in November, and 2 to 3 hours in December. Petrone Aff. at ¶¶15-18. By sometime in January 2002, he was sleeping only one hour a day. *Id.* at ¶19.

On plaintiff's initial visit to Dr. Packard on January 9, 2002, plaintiff was placed back on medication. Thereafter, his insomnia rapidly improved. According to Dr. Packard, plaintiff reported that he was sleeping "okay" on January 16, 2002 – just one week later. On January 29, 2002, plaintiff reported experiencing "some insomnia," but on February 5, 2002, plaintiff reported no trouble sleeping or eating.

These facts suggest that plaintiff's insomnia can be controlled by medication. Although Dr. Lubit states that it is advisable that plaintiff discontinue the use of these medications periodically, Lubit Aff. at ¶17, the record indicates that plaintiff developed insomnia over a period of weeks after discontinuing his medication. Dr. Lubit states that plaintiff's treating psychiatrist can place plaintiff back on the medication when his symptoms return. *Id.* at ¶19. While that medication "requires time to take effect," *id*. at ¶11, the record suggests that the medication improves plaintiff's symptoms rapidly.

Dr. Lubit claims that it is "extremely likely" that plaintiff's symptoms will manifest themselves even during the periods in which plaintiff is on medication. Lubit Aff. at ¶22. According to Dr. Lubit, those symptoms "can include difficulty sleeping for periods of time from weeks to months." *Id*. at ¶23. However, there is no proof that plaintiff has suffered from substantial period of insomnia while on medication. Indeed, plaintiff's affidavit suggests that plaintiff last experienced insomnia in 2004, when he discontinued his medication because of delays in obtaining a prescription.

***Regarded As Disabled***

Even though plaintiff has not established that he meets subsection (A)'s definition of disabled, plaintiff may still establish disability for purposes of the ADA under subsection (C) by establishing that his employer regarded him as disabled. "An individual need not actually have a[n] . . . impairment to state a claim under the ADA . . . ." *Francis v. City of Meriden*, 129 F.3d 281, 284 (2d Cir. 1997). "A plaintiff is also disabled within the meaning of the ADA if he is 'regarded' by his employer as having a physical or mental impairment that substantially limits a major life activity." *Capobianco v. City of New York*, 422 F.3d 47, 57 (2d Cir. 2005).

In *Sutton v. United Air Lines, Inc*, *supra*, the Supreme Court observed that "[t]here are two apparent ways" in which an employee can be regarded as disabled: (1) where the "covered entity mistakenly believes that a person has a[n] . . . impairment that substantially limits one or more major life activities," or (2) where the "covered entity mistakenly believes that an actual, nonlimiting impairment substantially limits one or more major life activities." *Sutton*, 527 U.S. at 489. The Supreme Court observed:

> In both cases, it is necessary that a covered entity entertain
> misperceptions about the individual – it must believe either that
> one has a substantially limiting impairment that one does not have
> or that one has a substantially limiting impairment when, in fact,
> the impairment is not so limiting.

*Id.* Accordingly, the question of "whether an individual is 'regarded as' having a disability 'turns on the employer's perception of the employee' and is therefore 'a question of intent, not whether the employee has a disability.'" *Colwell v. Suffolk County Police Dep't*, 158 F.3d 635, 646 (2d Cir. 1998) (quoting *Francis*, 129 F.3d at 284).

Comments by employees who lack the ability to hire and fire may be insufficient to establish that the employer regarded an employee as disabled. For example, in *Stephan v. West Irondequoit Central School District*, 450 Fed. Appx. 77 (2d Cir. Dec. 13, 2011) (summary order), the Second Circuit held that evidence that the plaintiff's supervisor referred to plaintiff by derogatory names, such as "retard," "Special Edna," and "Crystal Meth," was insufficient to establish that the plaintiff was regarded as disabled. Citing to *EEOC v. J.B. Hunt Transp., Inc.*, 321 F.3d 69, 74 (2d Cir. 2003), for the proposition that "comments[ ] made by people other than the ultimate hiring authorities[ ] simply are not sufficient" to indicate that the employer regarded job candidates as disabled, the Court of Appeals held that, because the supervisor "did not have ultimate authority over hiring or firing decisions," the supervisor's comments were "insufficient to demonstrate that Stephan's employer regarded her as disabled." *Stephan*, 450 Fed. Appx. at 80 (brackets in original).

Moreover, "[i]t is not enough . . . that the employer regarded that individual as somehow disabled . . . ." *Colwell*, 158 F.3d at 646. "[T]he plaintiff must show that the employer regarded the individual as disabled *within the meaning of the ADA*." *Id.* (emphasis in original). In other words, "the employer must regard the employee as . . . having an impairment that substantially limits a major life activity." *Capobianco*, 422 F.3d at 57; *see Jacques v. DiMarzio, Inc.*, 386 F.3d 192, 201 (2d Cir. 2004). In addition, when the major life activity in question is working, the plaintiff must be perceived as unable to perform a "broad class of jobs." *See Giordano v. City of New York*, 274 F.3d 740, 749-50 (2d Cir. 2001).

In this case, plaintiff argues that three comments made by Superintendent McKenna permit an inference that HBUFSD regarded plaintiff as disabled with regard to the major life

activity of working.  First, during his conversations with Lerner, McKenna referred to plaintiff as a "nut" on at least two occasions.  Lerner Dep. at 76-77.  Second, during the executive session at which the School Board accepted plaintiff's resignation, McKenna described plaintiff's condition by saying something to the effect of: "he's had a tough time, a mental breakdown or whatever, he just can't come to work." McKenna Dep. at 68.  Third, McKenna testified at his deposition that, at the time he obtained plaintiff's resignation, he felt that plaintiff's "extended absences rendered him unfit to be a teacher."  *Id.* at 83.

Drawing all inferences in plaintiff's favor, these comments may be sufficient to support the inference that McKenna mistakenly believed that plaintiff's mental impairments substantially limited plaintiff's ability to work as a teacher.  First, it is undisputed that Dr. Packard provided HBUFSD with some information regarding plaintiff's mental condition in a letter dated January 16, 2002, in which he stated that plaintiff was under his care for GAD and PD and was "currently unable to work."  Def. 56.1 Stat. at ¶33; Pl. 56.1 Stat. at ¶33.  While McKenna may not have fully understood the diagnosis, McKenna's references to plaintiff as a "nut" who had suffered "a mental breakdown" permit the inference that McKenna believed that plaintiff had some sort of mental impairment.

Second, it is undisputed that McKenna never received a prognosis from Dr. Packard, estimating when, if ever, plaintiff would be able to return to work.  Def. 56.1 Stat. at ¶¶38-40, 47; Pl. 56.1 Stat. at ¶¶38-40, 47.  McKenna's comments permit the inference that McKenna, faced with this lack of information, assumed that plaintiff's condition would permanently prevent him from coming to work, or at least result in extended absences which would substantially limit plaintiff's ability to work as a teacher.

37

Moreover, because McKenna was HBUFSD's Superintendent at the time he made the comments, his comments may suffice to establish the employer's misconceptions. To be sure, McKenna himself may not have possessed the authority to hire or fire employees, as evidenced by the fact that the School Board voted to accept plaintiff's resignation. Def. 56.1 Stat. at ¶66; Pl. 56.1 Stat. at ¶66. However, the undisputed evidence establishes that the School Board acted pursuant to McKenna's recommendations, suggesting that McKenna wielded considerable influence over personnel decisions.

The arguments contained in Defendants' Reply Memorandum of Law ("Defendants' Reply") with respect to this issue are unpersuasive. First, defendants argue that, because plaintiff never provided an estimate of when he would return to work, "there can be no mistake attributed to the defendants." Defendants' Reply at 5. However, this argument ignores the fact that the misperceptions which result in an employee being regarded as disabled "often resul[t] from stereotypic assumptions not truly indicative of . . . individual ability." *Sutton*, 527 U.S. at 489 (internal quotations omitted; brackets and ellipses in original).

Next, defendants cite to a case for the proposition that an employer cannot have mistakenly regarded an employee as disabled "[w]here, as here, an employer bases its conclusions on a doctor's evaluation." Defendants' Reply at 5 (citing *Jones v. United Parcel Serv., Inc.*, 411 F. Supp. 2d 1236, 1258 (D.Kan. 2006)). However, defendants' conclusions were not based on Dr. Packard's note, which only indicated that plaintiff was being treated for GAD and PD. This established only that plaintiff had a mental impairment, not that he was disabled as defined by the ADA. *See Toyota Motor Mfg.*, 534 U.S. at 195 ("Merely having an impairment does not make one disabled for purposes of the ADA.").

Finally, defendants distinguish some of the cases on which plaintiff relies. However, this Court's analysis does not rely on any of the cases which defendants distinguish. Accordingly, none of defendants' argument persuade this Court to grant summary judgment with respect to plaintiff's claim that he was regarded as disabled by HBUFSD.

## B. Qualified Individual

The second argument raised in the first point of Defendants' Memo contends, *inter alia*, that plaintiff was not a "qualified individual" under the ADA. The ADA defines the term "qualified individual" to mean "an individual who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds . . . ." 42 U.S.C. § 12111(8). Although the term "qualified individual" is not used in describing the elements of the ADA claims at issue here, those ADA claims incorporate the requirement that a plaintiff be a "qualified individual." To establish a *prima facie* case of disability discrimination under the ADA, a plaintiff must show, *inter alia*, that "he was otherwise qualified to perform the essential functions of his job, with or without reasonable accommodation." *Cameron*, 335 F.3d at 63. Similarly, to make out a *prima facie* case of disability discrimination arising from a failure to accommodate, a plaintiff must show, *inter alia*, that "with reasonable accommodation, plaintiff could perform the essential functions of the job at issue." *McBride*, 583 F.3d at 96-97.

"[T]he plaintiff bears the burden of production and persuasion on the issue of whether she is otherwise qualified for the job in question." *Borkowski v. Valley Cent. Sch. Dist.*, 63 F.3d 131, 137 (2d Cir. 1995).[11] Since "[a] plaintiff cannot be considered 'otherwise qualified' unless

_____

[11]Although *Borkowski* was decided in the context of a Rehabilitation Act case, the allocation of burdens enunciated in *Borkowski* also apply in an ADA case. *See Roberts v. Royal Atl. Corp.*, 542 F.3d 363, 370 (2d Cir. 2008); *see also* Henry H. Perritt, Jr., *Americans with Disabilities Act Handbook* § 1.02 (4th ed. 2003) ("The definition of disability is identical under

she is able, with or without assistance, to perform the essential functions of the job in question[,] . . . [i]t follows that the plaintiff bears the burden of proving either that she can meet the requirements of the job without assistance, or that an accommodation exists that permits her to perform the job's essential functions." *Id*. at 137-38 (internal citation omitted). "To establish a 'reasonable accommodation,' a plaintiff 'bears only a burden of production' that 'is not a heavy one.'" *Roberts v. Royal Atl. Corp*., 542 F.3d 363, 370 (2d Cir. 2008) (quoting *Borkowski*, 63 F.3d at 138. As the Second Circuit has noted:

> [I]t would be enough for the plaintiff to suggest the existence of a plausible accommodation, the costs of which, facially, do not clearly exceed its benefits. Once the plaintiff has done this, she has made out a *prima facie* showing that a reasonable accommodation is available, and the risk of nonpersuasion falls on the defendant.

*Id.* (internal quotations and citation omitted).

In this case, the only "reasonable accommodation" suggested by plaintiff is "[a] temporary leave of absence" to enable plaintiff "to treat the symptoms of his . . . disability and then return to work." Plaintiff's Opposition at 13. However, "[c]ourts have disagreed about whether paid or unpaid leave can constitute a reasonable accommodation under the ADA." *Cehrs v. Northeast Ohio Alzheimer's Research Center*., 155 F.3d 775, 782 (6th Cir. 1998). As the *Cehrs* Court noted:

> Some courts . . . have *presumed* that regular and predictable attendance is [a] job requirement. *See Dutton v. Johnson County Bd. of County Com'rs*, 859 F.Supp. 498, 507 (D.Kan. 1994) (collecting cases). This presumption naturally leads to the conclusion that an individual who must occasionally request medical leave is unqualified. Other courts disagree.

the [ADA and the Rehabilitation Act], as are the basic concepts of discrimination [and] reasonable accommodation . . . .").

*Id.* (emphasis in original; brackets added).

The Second Circuit has not decided this issue. To be sure, the Second Circuit has held that the ADA does not require an employer to give an employee an indefinite leave of absence where there is no expectation that the employee would be able to return to work. *See Mitchell v. Washingtonville Cent. Sch. Dist.*, 190 F.3d 1, 9 (2d Cir. 1999). The Second Circuit has not ruled, however, whether a finite unpaid leave of absence is a reasonable accommodation under the ADA. *Graves*, 457 F.3d at 185 n. 5. In *Graves*, the Court noted "that the idea of unpaid leave of absence as a reasonable accommodation presents 'a troublesome problem, partly because of the oxymoronic anomaly it harbors' – the idea that allowing a disabled employee to leave a job allows him to perform that job's functions – 'but also because of the daunting challenge of line-drawing it presents.'" *Id.* (quoting *Garcia-Ayala v. Lederle Parenterals, Inc.*, 212 F.3d 638, 651-52 (O'Toole, J., dissenting)). Yet, the *Graves* Court also noted:

> [E]ven Judge O'Toole would not read the ADA literally, requiring a reasonable accommodation to be effective immediately in enabling an employee to perform the essential functions of his or her job. Instead he allows, as have most courts, that "*some* leaves of absence might qualify as reasonable accommodations."

*Id.* (quoting *Garcia-Ayala*, 212 F.3d at 655) (emphasis in *Garcia-Ayala*).

The Second Circuit has held, however, that even assuming leaves of absence taken in order to permit the employee to recover from the employee's disability are "reasonable accommodations" under the ADA, those leaves "must enable the employee to perform the essential functions of his job." *Graves v. Finch Pruyn & Co., Inc.*, 353 Fed.Appx. 558, 560 (2d Cir. 2009) (summary order). Moreover, "the employee must make a showing that the reasonable accommodation would allow him to do so at or around the time at which it is sought." *Id.* (citing

*Myers v. Hose*, 50 F.3d 278, 283 (4th Cir. 1995)). Unless the employee has provided the employer with some "assurance that [the] requested accommodation would allow him to perform the essential functions of his job," the employee has not established that he was a qualified individual. *Id.* at 561.

The parties in this case essentially urge this Court to decide the issue left open by the Second Circuit. Defendants cite to various cases for the proposition that "employees . . . who are incapable of regular attendance . . . are not qualified to perform the essential functions of their position," and argue that "it is untenable for plaintiff to claim that regular in-class attendance is not an essential aspect of a teacher's job." Defendants' Memo at 9. Plaintiff cites to various cases – all of which were decided prior to *Graves* – which held that temporary medical leaves are reasonable accommodations, and cites to that portion of plaintiff's 2004 deposition in which plaintiff testified that he told McAleese that he might be out "between a few and several weeks." Plaintiff's Opposition at 13-15 (citing to 2004 Petrone Dep. at 120).

This Court need not resolve the issue because the uncontroverted evidence establishes that plaintiff never provided HBUFSD with any assurances that he could return to work following a temporary leave. When plaintiff first informed the District of his illness on January 10, 2002, plaintiff told Cahill only that he was "ill" and might need to be out "for a while." Def. 56.1 Statement at ¶25; Pl. 56.1 Statement at ¶25. In response to Cahill's directions that plaintiff obtain a note from his doctor, plaintiff arranged for Dr. Packard to send a letter. However, the letter which Dr. Packard sent to the District on January 16, 2002, stated only that plaintiff was under the doctor's care for GAD and PD and was unable to work. That letter did not provide an estimate of when plaintiff could return to work. When McKenna telephoned Dr. Packard on

January 22, 2002, to request this information, Dr. Packard could only say that it was "too early to tell" when plaintiff might return.  Def. 56.1 Statement at ¶37; Pl. 56.1 Statement at ¶37.

On or about January 24, 2002, plaintiff spoke to McAleese via telephone.  At his 2004 deposition, Plaintiff testified that he told McAleese that he was taking a medicine that "should have [him] stabilized within a certain period of time."  2004 Petrone Dep. at 119.  However, plaintiff did not give McAleese a specific date.  *Id.*  Rather, plaintiff recalled giving "a general range of time," telling him "it would be between a few and several weeks."  *Id*. at 120-21. McAleese told plaintiff to notify him as soon as he was ready to return to work, and plaintiff agreed to do so.  *Id*. at 121.

McAleese did not receive any further information concerning plaintiff's condition. Although plaintiff claims that he called McAleese on February 5, 2002, he concedes that he was unable to reach him.  Pl. 56.1 Statement at ¶45.  Moreover, it is undisputed that Dr. Packard did not contact HBUFSD again after his January 22, 2002, conversation with McKenna.  Def. 56.1 Statement at ¶38; Pl. 56.1 Statement at ¶38.

On February 8, 2002 – more than two weeks after McAleese's conversation with plaintiff – McKenna mailed plaintiff a letter demanding a prognosis from plaintiff's doctor, estimating when plaintiff might return to work.  Def. 56.1 Stat. at ¶45; Pl. 56.1 Stat. at ¶45.  It is undisputed that plaintiff never provided the prognosis which the Superintendent demanded.  Def. 56.1 Stat. at ¶47; Pl. 56.1 Stat. at ¶47.  Moreover, although McKenna's letter directed plaintiff to call him regarding McKenna's offer of an unpaid, fixed-term leave of absence, plaintiff never spoke with McKenna.  Plaintiff claims that he called McKenna on February 10, 2002, but that McKenna did not call him back.  Plaintiff never attempted to contact McKenna again because he mistakenly

believed that the School Board had placed him on a fixed-term leave of absence at the February 12 meeting and that it was no longer necessary to do so.

Plaintiff also never attempted to call McAleese again, even after being informed in late February 2002 that McAleese and McKenna were prepared to terminate him. Plaintiff's failure to call was not due to his mental condition, since he called Lerner on several occasions during that period. Rather, as plaintiff explained in his letter to McAleese dated March 4, 2002, he did not call because his physician could not tell plaintiff when he could return to work and plaintiff "was not able to even guess as to when [he] could return." Savoiardo Declaration, Ex. P. Since plaintiff did not, and could not, provide HBUFSD with any assurance that a temporary leave of absence would allow him to resume teaching, plaintiff never established that he was a qualified individual. *See Graves*, 353 Fed. Appx. at 560.

### C. Constructive Termination

The fifth argument raised in the first point of Defendants' Memo asserts that plaintiff cannot make out the fourth element of a *prima facie* case of discriminatory discharge – namely, that plaintiff suffered an adverse employment action because of his disability. Without citing to any cases relating to constructive termination, defendants argue that plaintiff cannot establish an adverse employment action because he resigned. Defendants' Memo at 14-15. Plaintiff's Opposition also makes no mention of cases relating to constructive discharge, arguing instead that a reasonable jury could conclude that HBUFSD acted with an impermissible animus when it forced plaintiff to resign. Plaintiff's Opposition at 16-17.

Neither party has addressed the central issue of whether McKenna's threats, communicated through Lerner, can constitute constructive discharge. "[T]hreats of termination

alone have occasionally been held to be sufficient to permit a rational trier of fact to find that a reasonable person in the employee's shoes would have felt compelled to resign." *Murray v. Town of N. Hempstead*, 853 F. Supp. 2d 247, 270 (E.D.N.Y. 2012). For example, in *Lopez v. S.B. Thomas, Inc*., 831 F.2d 1184 (2d Cir. 1987), the Second Circuit held that a reasonable jury might find constructive discharge from the fact that the plaintiff's supervisor "told him he would be fired at the end of the 90-day probationary period no matter what he did to improve his allegedly deficient performance." *Id*. at 1188-89 (citing *Welch v. Univ. of Tex. & Its Marine Science Inst*., 659 F.2d 531, 533-34 (5th Cir. 1981), as finding constructive discharge where employer clearly expressed his desire that employee resign because such a statement would force a reasonable person to resign). However, "the availability of alternatives to resignation, such as complaint procedures, may preclude a finding of constructive discharge." *Murray*, 853 F. Supp. 2d at 270; *see also Silverman v. City of New York*, 216 F. Supp. 2d 108, 116 (E.D.N.Y. 2002) ("the fact that [plaintiff] could have sought a hearing before being terminated eviscerates his claim that threats of termination created an 'intolerable' situation which left him with but one choice: resignation"); *Katz v. Beth Israel Med. Ctr*., No. 95 Civ. 7183 AGS, 2001 WL 11064, at *13 (S.D.N.Y. Jan. 4, 2001) (no constructive discharge where employee voluntarily resigned after at least one threat of termination instead of filing grievance pursuant to collective bargaining agreement).

In this case, McKenna told Lerner that plaintiff would be fired unless he resigned. However, it is undisputed that plaintiff was aware that he, as a member of the teacher's union, could file a grievance against the District even though he was untenured. Pl. 56.1 Statement at ¶63; Def. 56.1 Statement at ¶63. Indeed, plaintiff discussed filing a grievance with Lerner, but

Lerner advised against it. Pl. 56.1 Statement at ¶62; Def. 56.1 Statement at ¶62. Plaintiff ultimately elected to accept the package worked out by Lerner, which offered the prospect that plaintiff might receive disability payments during some portion of his leave. However, according to Lerner, plaintiff "took . . . a few days . . . to make up his mind," during which Lerner engaged in further negotiations at plaintiff's behest and plaintiff consulted with one of his professors from Southampton University. Lerner Dep. at 137, 147.

In light of these facts, it is unclear whether McKenna's indirect threats alone would be sufficient to make out constructive discharge. However, since the parties have not briefed this issue and since this Court has already determined that plaintiff has failed to make out the third element of a *prima facie* case of discriminatory discharge – *i.e.*, that he was otherwise qualified to perform the essential functions of his job – there is no need to resolve this issue at this juncture.

This Court also declines to address the question – raised only in Plaintiff's Opposition – of whether McKenna's threats of discharge were at all caused by plaintiff's disability. However, this Court notes that Lerner himself was uncertain whether McKenna's threats were "at all related to [plaintiff's] medical condition," saying that they weren't "clearly linked." Lerner Dep. at 139. Indeed, when asked, "Did [McKenna] discuss that he wanted to get rid of [plaintiff] because of his medical condition?" Lerner replied, "What he was most adamant about was the fact that he was not informed as to whether or not [plaintiff] was coming back on a certain targeted date." *Id*. at 125.

### D. Reasonable Accommodation

The third and fourth arguments raised in the first point of Defendants' Memo relate to the third cause of action – alleging that HBUFSD violated 42 U.S.C. § 12112(b)(5)(A) by failing to provide plaintiff with a reasonable accommodation – and the fifth cause of action – alleging that HBUFSD violated 42 U.S.C. § 12112(b) by failing to engage plaintiff in "an interactive process that would have facilitated the provision of a reasonable accommodation."  In the third argument, defendants claim that plaintiff never sought a reasonable accommodation and that, because Dr. Packard was unsure of when plaintiff could return to work, no accommodation was possible.  In the fourth argument, defendants assert that HBUFSD was not required to engage in an interactive process because plaintiff never requested a reasonable accommodation and that HBUFSD made reasonable efforts to engage in the interactive process.[12]  This Court will address the fourth argument first.

---

[12]Defendants' arguments touch on an open question in this Circuit:  whether the ADA requires accommodation of a disability that the claimant is regarded as having but does not in fact have.  There is a split of authority on this question.  Some of the circuits to have expressly addressed this question have concluded that plaintiffs who are "regarded as," but not actually, disabled are not entitled to reasonable accommodations under the ADA. *See Kaplan v. City of North Las Vegas*, 323 F.3d 1226, 1232-33 (9th Cir. 2003), *Weber v. Strippit, Inc.*, 186 F.3d 907, 916-17 (8th Cir. 1999); *Workman v. Frito-Lay, Inc.*, 165 F.3d 460, 467 (6th Cir. 1999); *Newberry v. E. Texas State Univ.*, 161 F.3d 276, 280 (5th Cir. 1998).  Other Circuits have reached the opposite conclusion.  *See Williams v. Philadelphia Housing Auth. Police Dep't*, 380 F.3d 751, 772-76 (3d Cir. 2004), *cert. denied*, 544 U.S. 961 (2005); *Kelly v. Metallics West, Inc.*, 410 F.3d 670, 675-76 (10th Cir. 2005); *D'Angelo v. ConAgra Foods, Inc.*, 422 F.3d 1220, 1235-39 (11th Cir. 2005).

The Second Circuit has not yet addressed the issue. *See Cameron v. Cmty. Aid for Retarded Children, Inc*., 335 F.3d 60, 64 (2d Cir. 2003) (declining to decide the issue).  However, several district court cases in this Circuit have held that plaintiffs who are regarded as disabled are entitled to reasonable accommodations.  *See, e.g.*, *Shannon v. Verizon New York, Inc*., 519 F. Supp. 2d 304, 308 (N.D.N.Y. 2007); *Jacques v. DiMarzio, Inc.*, 200 F. Supp. 2d 151, (E.D.N.Y. 2002).  Although this Court finds the reasoning of these district court opinions to be persuasive, this Court need not address this issue because, as explained below, the undisputed facts in this case establish that plaintiff never sought a reasonable accommodation and that it was plaintiff, not defendants, who failed to engaged in the interactive process.

### 1. The Interactive Process

"An employer violates the ADA and the Rehabilitation Act when it fails to 'mak[e] reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee,' unless the employer can establish that the accommodations would 'impose an undue hardship.'" *Jackan v. N.Y. State Dep't of Labor*, 205 F.3d 562, 566 (2d Cir. 2000) (quoting 42 U.S.C. § 12112(b)(5)(A)). "The ADA envisions an 'interactive process' by which employers and employees work together to assess whether an employee's disability can be reasonably accommodated." *Id*.

"[G]enerally, 'it is the responsibility of the individual with a disability to inform the employer that an accommodation is needed.'" *Graves*, 457 F.3d at 184 (quoting 29 C.F.R. pt. 1630, app. at 363 (2003)). In light of this general rule, some courts have held that "it is the employee's initial request for an accommodation which triggers the employer's obligation to participate in the interactive process of determining one." *Sidor v. Reno*, No. 95 Civ. 9588 (KMW), 1997 WL 582846, at *6 (S.D.N.Y. Sept. 19, 1997) (quoting *Taylor v. Principal Fin. Group, Inc*., 93 F.3d 155, 165 (5th Cir. 1996)). Indeed, the Second Circuit has cited this language from *Sidor* and *Taylor* with approval in two unreported cases decided in 2002. *See MacGovern v. Hamilton Sunstrand Corp*., 50 Fed. Appx. 59, 60 (2d Cir. 2002) (summary order); *Miletta v. Waste Management of N.Y.*, 46 Fed. Appx. 31, 32 (2d Cir. 2002) (summary order).

Prior to 2008, however, the Second Circuit had "not had occasion . . . to determine when the general rule announced in *Graves* might be inapplicable." *Brady v. Wal-Mart Stores, Inc*., 531 F.3d 127, 135 (2d Cir. 2008)). In 2008, the Second Circuit considered this issue and identified exceptions to this general rule. In *Brady*, the Second Circuit held "that an employer

has a duty reasonably to accommodate an employee's disability if the disability is obvious –

which is to say, if the employer knew or reasonably should have known that the employee was

disabled." 531 F.3d at 135. The Second Circuit ruled:

> [I]t was reasonable for the jury to find that Brady was disabled
> and/or that [his former employer, Wal-Mart, and his former boss]
> perceived him to be disabled. Accordingly, Wal-Mart was
> obligated to engage in the aforementioned interactive process.
> Wal-Mart failed to engage in this process, and therefore the district
> court was correct in declining to grant judgment as a matter of law
> on the failure to accommodate claim.

*Id*. at 135-36. The Second Circuit also noted:

> [A] situation in which an employer perceives an employee to be
> disabled but the employee does not so perceive himself presents an
> even stronger case for mitigating the requirement that the
> employee seek accommodation. In such situations, the disability is
> obviously known to the employer, while the employee, because he
> does not consider himself to be disabled, is in no position to ask
> for an accommodation. A requirement that such an employee ask
> for accommodation would be tantamount to nullifying the statutory
> mandate of accommodation for one entire class of disabled (as that
> term is used in the ADA) employees.

*Id*. at 135.

The fourth argument raised in the first point of Defendants' Memo relies on cases

decided prior to *Brady*. Citing to two unreported district court cases decided in 1998 and 2002,

defendants argue that "an employer's duty to engage in [the] . . . interactive process is only

triggered once the employee requests a reasonable accommodation." Defendants' Memo at 13

(citing *Thompson v. City of New York*, No. 98 Civ. 4725 (GBD), 2002 WL 31760219, at *8

(S.D.N.Y. Dec. 9, 2002), and *Shelton v. Gen. Elec. Aerospace Div*., No. 95-CV-112 RSP/GJD,

1998 WL 187413, at *10 (N.D.N.Y. Apr. 14, 1998)). Defendants reason that because plaintiff

"did not seek any accommodation from the District, the District had no duty or obligation" to

engage in the interactive process or to offer any accommodation to plaintiff.  *Id*.  However, post-*Brady*, it is clear that "under certain circumstances, an employer is required to act proactively and engage in an interactive process to accommodate the disability of an employee even if the employee does not request accommodation."  *McElwee v. County of Orange*, 700 F.3d 635, 642 (2d Cir. 2012) (quoting *Brady*, 531 F.3d at 135).  Accordingly, defendants' argument that HBUFSD had no obligation to engage in the interactive process simply because plaintiff never requested an accommodation lacks merit.

### 2.  The Possibility of a Reasonable Accommodation

In analyzing defendants' third argument, this Court notes preliminarily that the failure to engage in the interactive process does not give rise to an ADA claim in the absence of evidence that an accommodation was possible.  As the Second Circuit explained in *McBride*, 583 F.3d 92, "the ADA imposes liability for, *inter alia*, discriminatory refusal to undertake a feasible accommodation, not mere refusal to explore possible accommodations where, in the end, no accommodation was possible."  *Id*. at 100.  Accordingly, "an employer's failure to engage in a sufficient interactive process does not form the basis of a claim under the ADA . . . unless [the plaintiff] also establishes that, at least with the aid of some identified accommodation, [the plaintiff] was qualified for the position at issue."  *Id.* at 101.

In this case, plaintiff never identified an accommodation which would have enabled him to perform the essential functions of the job.  Plaintiff contacted the HBUFSD administration on only three occasions.  On January 10, 2002, plaintiff called Cahill to tell her he might need to be out "for a while."  The next day, he wrote to McKenna to request an additional ten sick days.  Finally, on or about January 24, 2002, plaintiff called McAleese and told him that it would be

"between a few and several weeks" before he could return. Even assuming that these communications could be construed as requesting a temporary leave of absence, and that such a leave could constitute a reasonable accommodation, plaintiff offered no assurances that this accommodation would render him "qualified" to return to teaching. Accordingly, plaintiff has not stated a claim for failure to engage in the interactive process. *See McBride*, 583 F.3d at 101.

Moreover, even if plaintiff could state such a claim, the undisputed facts in this case establish that it was plaintiff, not defendants, who failed to engage in the interactive process. Defendants promptly granted plaintiff's only specific request, seeking ten additional sick days. Plaintiff made no explicit requests thereafter, even though plaintiff promised McAleese that he would notify him when he was ready to return to work. McAleese called plaintiff on several occasions for an update on plaintiff's prognosis, but was unable to reach him.

Since plaintiff did not communicate with HBUFSD, McKenna unilaterally proposed accommodations. By letter dated February 8, 2002, McKenna informed plaintiff that he intended to ask the School Board to grant him leave pursuant to the FMLA, which would have allowed plaintiff up to 12 weeks of unpaid leave. McKenna also offered plaintiff an unpaid, fixed-term leave of absence for the remainder of the school year. McKenna's letter directed plaintiff to call him regarding the offer, but plaintiff failed to do so.

Despite plaintiff's failure to engage in the interactive process, defendants afforded plaintiff at least one of the accommodations listed in McKenna's letter. Upon McKenna's recommendation, the School Board granted plaintiff up to 12 weeks of unpaid leave under the FMLA beginning on February 13, 2002. Because plaintiff resigned before that 12-week period ended, it is unclear whether HBUFSD would have continued plaintiff on unpaid leave for the

remainder of the school year. However, Lerner himself did not think that plaintiff would be terminated before he returned to school, stating: "What would have happened was that if . . . and when John came back he would be observed and would be found wanting in certain areas and, therefore, his days in Hampton Bays would have been numbered." Lerner Dep. at 167.

For these reasons, this Court find that plaintiff has failed to make out the fourth element of a *prima facie* case of disability discrimination arising from a failure to accommodate – namely, that the employer refused to make reasonable accommodations. In addition, plaintiff cannot recover under the fifth cause of action because he offered HBUFSD no assurances that a leave of absence would enable him to return to work. Moreover, the undisputed evidence in this case establishes that it was plaintiff, not HBUFSD, who failed to engage in the interactive process envisioned by the ADA.

### E. Rehabilitation Act

The arguments contained in the first point of Defendants' Memo do not expressly mention section 504 of the Rehabilitation Act. However, as plaintiff concedes, "the same standards govern discrimination under the Americans with Disabilities Act and section 504 of the Rehabilitation Act." Plaintiff's Opposition at 2 n.1 (citing *Lyons v. Legal Aid Soc'y*, 68 F.3d 1512, 1515 (2d Cir. 1995)). To make out a claim of employment discrimination under section 504 of the Rehabilitation Act, a plaintiff "must establish that (1) she is an individual with a disability within the meaning of the Act, (2) she is otherwise qualified to perform the job in question, (3) she was excluded from the job solely because of her disability, and (4) her employer received federal funding." *Borkowski*, 63 F.3d at 135. At least the first two of these elements are the same as the elements of the ADA claims previously discussed. Moreover, the

ADA's standards govern determinations whether employers have violated the employment provisions of the Rehabilitation Act. *See* 29 U.S.C. § 794(d); see also Henry H. Perritt, Jr., *Americans with Disabilities Act Handbook* § 1.02 (4th ed. 2003) ("[t]he definition of disability is identical under the [ADA and the Rehabilitation Act], as are the basic concepts of discrimination [and] reasonable accommodation . . . .").

Since defendants' arguments relating to plaintiff's ADA claims are equally applicable to plaintiff's Rehabilitation Act claims, defendants are also entitled to summary judgment on the Rehabilitation Act claims. Plaintiff's second and fourth causes of action are, therefore, dismissed.

## III. Plaintiff's Stigma-Plus Claims

In the second point of Defendants' Memo, defendants seek summary judgment on the sixth and seventh causes of action alleged in plaintiff's Second Amended Complaint. These causes of action are brought pursuant to 42 U.S.C. §1983, and allege that McKenna violated plaintiff's procedural due process rights by "informing member of [the HBUFSD] School Board" and unspecified "others" that plaintiff "suffered a 'nervous breakdown' and quit" and "was 'a lousy teacher' who should 'never have been hired.'" Second Amended Complaint at ¶¶ 55, 57. The sixth cause of action alleges that McKenna's statements violated plaintiff's "liberty interest in his good name and reputation," *id*. at ¶ 55, while the seventh cause of action alleges that these statements violated plaintiff's "liberty interest in his reputation for professional competence." *Id.* at ¶ 57.

These two causes of action advance "stigma-plus" claims, which involve an "injury to one's reputation (the stigma) coupled with the deprivation of some 'tangible interest' or property

right (the plus), without adequate process." *DiBlasio v. Novello*, 344 F.3d 292, 302 (2d Cir. 2003). "To establish a 'stigma plus' claim, a plaintiff must show (1) 'the utterance of a statement sufficiently derogatory to injure his or her reputation, that is capable of being proved false, and that he or she claims is false' and (2) 'a material state-imposed burden or state-imposed alteration of the plaintiff's status or rights.'" *Vega v. Lantz*, 596 F.3d 77, 81 (2d Cir. 2010) (quoting *Sadallah v. City of Utica*, 383 F.3d 34, 38 (2d Cir. 2004)); *see also Monserrate v. N.Y. State Senate*, 599 F.3d 148, 158 (2d Cir. 2010). However, a plaintiff generally is required only to raise the falsity of these stigmatizing statements as an issue, not prove they are false. *Brandt v. Bd. of Coop. Educ. Servs.*, 820 F.2d 41, 43 (2d Cir. 1987).

"[D]amage to one's reputation is not 'by itself sufficient to invoke the procedural protection of the Due Process Clause.'" *Valmonte v. Bane*, 18 F.3d 992, 999 (2d Cir. 1994) (quoting *Paul v. Davis*, 424 U.S. 693, 701 (1976)). Rather, "loss of reputation must be coupled with some other tangible element in order to rise to the level of a protectible liberty interest." *Id.* In the case of government employees, such as plaintiff, that "tangible element" may involve the loss of government employment. *See Patterson v. City of Utica*, 370 F.3d 322, 330 (2d Cir. 2004). Thus, "[f]or a government employee, a cause of action under § 1983 for deprivation of a liberty interest without due process of law may arise when an alleged government defamation occurs in the course of dismissal from government employment." *Id.* (citing *Bd. of Regents v. Roth*, 408 U.S. 564, 573 (1972)).

"In an action based on a termination from government employment, a plaintiff must satisfy three elements in order to demonstrate a deprivation of the stigma component of a stigma-plus claim." *Segal v. City of New York*, 459 F.3d 207, 212 (2d Cir. 2006) (citing *Patterson*, 370

F.3d at 330).  First, the plaintiff must "show that the government made stigmatizing statements about [the plaintiff] . . . ."  *Id.*  Second, the plaintiff "must prove these stigmatizing statements were made public."  *Id.*  Third, "the plaintiff must show that the stigmatizing statements were made concurrently with, or in close temporal relationship to, the plaintiff's dismissal from government employment."  *Id.*

Statements that "call into question [the] plaintiff's good name, reputation, honor, or integrity" satisfy the first of these three elements, as do statements that "denigrate the employee's competence as a professional and impugn the employee's professional reputation in such a fashion as to effectively put a significant roadblock in that employee's continued ability to practice his or her profession."  *Id.* (internal quotations and citations omitted).  However, in cases where a plaintiff is claiming that his professional reputation and competence have been impugned, the plaintiff must also "prove that future employment opportunities were foreclosed in order for his claim to be successful."  *Patterson*, 370 F.3d at 330, n.1.  Such proof is not required where the statements at issue involve criminal allegations or otherwise "obviously implicate a plaintiff's good name or honor."  *Id.*

The second point of Defendants' Memo principally argues that plaintiff has failed to make out one or more of the elements necessary to prove the stigma component.  First, defendant argues that plaintiff cannot make out the second element because the allegedly derogatory statements identified in the sixth and seventh causes of action were made during a closed-door "executive session," rather than during a public meeting of the School Board.  Second, defendants argue that plaintiff cannot prevail on the seventh cause of action – alleging damage to plaintiff's "reputation for professional competence" – because he cannot prove that any

employment opportunities were foreclosed.  Finally, defendants argue that McKenna's

comments were not so derogatory as to injure plaintiff's reputation and were merely expressions

of McKenna's opinion and incapable of being proved false.  For ease of analysis, this Court will

address the third argument first.

### A.  *The Nature of the Allegedly Stigmatizing Statements*

Preliminarily, this Court notes that the statements alleged in the sixth and seventh causes

of action are somewhat different from the statements which Plaintiff's Opposition lists in their

discussion of the stigma-plus claims.  The sixth and seventh causes of action allege that

McKenna violated plaintiff's procedural due process rights by "informing members of [the

HBUFSD] School Board" and unspecified "others" that plaintiff "suffered a 'nervous

breakdown' and quit" and "was 'a lousy teacher' who should 'never have been hired.'" Second

Amended Complaint at ¶¶ 55, 57.  In contrast, Plaintiff's Opposition lists the following three

statements:

> Dr. McKenna called Mr. Petrone "nuts" during conversation with
> Mr. Lerner . . . .  Dr. McKenna . . . informed the school board that
> Mr. Petrone had a mental breakdown.  Lastly during an executive
> session of the school board, in which plaintiff's forced resignation
> was accepted, Dr. McKenna stated plaintiff was a "lousy teacher."

Plaintiff's Opposition at 18 (internal citations omitted; ellipses added).

The first of the three statements listed in Plaintiff's Opposition is not mentioned in

plaintiff's Second Amended Complaint, despite the fact that discovery – included the deposition

at which Lerner testified about the "nuts" comment – was concluded long before the Second

Amended Complaint was drafted.  As a result, defendants did not address the "nuts" comment in

their motion papers.  However, since most of defendants' arguments are equally applicable to the

"nuts" comment, this Court will address all three of the comments listed in Plaintiff's Opposition.

In a single sentence in Defendants' Memo, defendants argue that "McKenna's statements were not sufficiently derogatory; did not cause any damage to plaintiff's personal or professional reputations and the statements are a matter of opinion that are not capable of being proved false." Defendants' Memo at 19. However, defendants offer no authority for the proposition that the statements at issue were not derogatory or factual in nature. Instead, defendants point to statements and testimony in which plaintiff conceded that he was unaware of anyone who had a negative opinion of him based on McKenna's statements. *Id.*

This Court finds no merit in the argument that McKenna's statements were not derogatory. However, there is a substantial question as to whether McKenna's comments were statements of fact or opinion. The Second Circuit has identified several factors that New York courts consider in determining whether a statement is a fact or an opinion:

> (1) [A]n assessment of whether the specific language in issue has a precise meaning which is readily understood or whether it is indefinite and ambiguous; (2) a determination of whether the statement is capable of being objectively characterized as true or false; (3) an examination of the full context of the communication in which the statement appears; and (4) a consideration of the broader social context or setting surrounding the communication including the existence of any applicable customs or conventions which might signal to readers or listeners that what is being read or heard is likely to be opinion, not fact.

*Kirch v. Liberty Media Corp.*, 449 F.3d 388, 403, n. 7 (2d Cir.2006) (citation and internal quotation marks omitted). The question of "[w]hether a statement is opinion or fact is a question of law for the court." *Handverger v. City of Winooski, Vt.*, No. 5:08-cv-246, 2013 WL

1386070, at *18 (D.Vt. Apr. 3, 2013) (citing *Mr. Chow of N.Y. v. Ste. Jour Azur, S.A.*, 759 F.2d 219, 224 (2d Cir. 1985)).

The question of whether the terms, "nuts," "mental breakdown," and "lousy" have such a precise meaning as to be capable of being proved true or false is a close one. However, this Court notes that "nuts" is specifically defined in the Merriam-Webster dictionary as meaning "crazy" or "insane," which plaintiff was not. *See* http://www.merriam-webster.com/dictionary/nuts. Similarly, the term "mental breakdown," which Merriam-Webster defines as a mental collapse, *see* http://www.merriam-webster.com/dictionary/breakdown, overstates plaintiff's difficulties. Finally, the term "lousy" – defined by Merriam-Webster as meaning "miserably poor or inferior," *see* http://www.merriam-webster.com/dictionary/lousy, might not accurately describe a teacher who, according to plaintiff, received adequate ratings. *See* Plaintiff's Opposition at 19. Especially in view of the fact that defendants have offered no analysis of whether McKenna's statements were factual or opinion, this Court is reluctant to find that McKenna's comments do not qualify as stigmatizing statements.

### B. The Publication Requirement

The factual question of whether plaintiff can prove that McKenna's statements actually damaged plaintiff's reputation is subsumed within the question raised by defendants' second argument: whether plaintiff has proved that the statements were publicized. "[T]he Supreme Court has made it clear that, to constitute deprivation of a liberty interest, the stigmatizing information must be both false . . . and made public . . . by the offending governmental entity." *Gentile v. Wallen*, 562 F.2d 193, 197 (2d Cir. 1977) (internal citations omitted). "The defamatory statement must be sufficiently public to create or threaten a stigma; hence, a

statement made only to the plaintiff, and only in private, ordinarily does not implicate a liberty interest." *Velez v. Levy*, 401 F.3d 75, 87 (2d Cir. 2005) (citing *Donato v. Plainview-Old Bethpage Cent. Sch. Dist.*, 96 F.3d 623, 631-32 (2d Cir. 1996)).

In their first argument, defendants assert that plaintiff has not established that the allegedly stigmatizing statements were made public. Defendants point out that plaintiff testified at his January 28, 2010, deposition that he himself did not know of anyone who had become aware of the comments McKenna made to the School Board during the executive session. Defendants' Memo at 17. Defendants also cite to three cases for the proposition that "statements made in a closed meeting do not satisfy the requisite publication requirement." *Id.* First, defendants cite to *Brevot v. N.Y. City Dep't of Educ.*, 299 Fed. App'x 19 (2d Cir. 2008), an unpublished summary order in which the Second Circuit opined that "an internal document circulated only within the Department [of Education]" did not meet the publication requirement. *Id.* at 21. Second, defendants cite to *Munno v. Town of Orangetown*, 391 F. Supp. 2d 263 (S.D.N.Y. 2005), in which Judge MacMahon granted a motion to dismiss a stigma-plus claim where the plaintiff's memorandum of law in opposition to the motion conceded that "there was no public discussion of the reasons for the suspension" and that the meeting at which the plaintiff's suspension was ordered was "closed to the public." *Id.* at 271. Third, defendants cite to *Skiff v. Colchester Bd. of Educ.*, 514 F. Supp. 2d 284 (D.Conn. 2007), which granted a defense motion for summary judgment with respect to a stigma-plus claim on various grounds, including the ground that allegedly stigmatizing statements were not made public. With respect to statements that were made at a "non-renewal hearing," The judge opined: "The hearing . . . was conducted in executive session, and Skiff had the opportunity to present his side and to question

the other. Such a hearing under these circumstances cannot create actionable stigma." *Id.* at 296.

Plaintiff's response to defendants' publication argument consists solely of an effort to distinguish *Skiff.* Plaintiff argues that the *Skiff* "does not stand for the proposition that statements made at an executive session of a School Board necessarily fail to satisfy the publication requirement," characterizing that case as holding "that statements made in an executive session in which the plaintiff had the opportunity to present his side and question the other side did not create actionable stigma." Plaintiff's Opposition at 20. However, Plaintiff's Opposition does not address the two other cases, or provide any evidence that McKenna's allegedly stigmatizing comments were made public.

Although *Skiff* may be distinguishable, this Court agrees with defendants that plaintiff has adduced no proof that the statements at issue were "sufficiently public to create or threaten a stigma." *See Velez*, 401 F.3d at 87. First, the record establishes that McKenna made the comments in which he described plaintiff as "a lousy teacher" who had suffered "a mental breakdown" during an executive session of the School Board. McKenna Dep. at 68, 71. According to McKenna, an "executive session" differed from a regular School Board meeting in that it was "private, between [McKenna] and the five board member prior to the [regular] meeting." *Id.* at 71. Although plaintiff claims that he subsequently learned of McKenna's comments through his own personal conversations with a School Board member, Pam Krantz, and other school employees, *see* Petrone Aff. at ¶65, there is no evidence that McKenna disseminated the comments or that they were memorialized in plaintiff's personnel records. Absent such evidence, this Court cannot find that the McKenna's comments were made public.

*See Brevot*, 299 Fed. App'x at 21 (finding the publication was not met when the allegedly stigmatizing statements were contained in "an internal document circulated only within the Department [of Education]").

Similarly, there is no evidence that the substance of McKenna conversation with Lerner was ever made public. At the time the statements were made, Lerner was serving as plaintiff's union representative, attempting to negotiate a deal on his behalf. Accordingly, the statements McKenna made to Lerner were tantamount to statements made to plaintiff himself, and did not implicate any liberty interests. *See Velez*, 401 F.3d at 87 (statements made in private to a plaintiff do not ordinarily implicate a liberty interest).

### C. Foreclosure of Employment Opportunities

Even if the evidence adduced by plaintiff were sufficient to establish publication, the seventh cause of action would have to be dismissed for failure to establish that the allegedly stigmatizing comments foreclosed any employment opportunities. First, plaintiff has adduced no evidence that the allegedly stigmatizing statements actually prevented him from obtaining employment. Plaintiff admits that he did not seek any teaching jobs in New York after he left HBUFSD. Petrone Aff. at ¶64. In his March 18, 2010, affidavit, plaintiff expressed a belief, based on conversations with unidentified "educational professors and other teachers," that "the educational community in New York is 'tight knit,'" and, accordingly, that the "circumstances surrounding [his] forced resignation from the HBUFSD would have been communicated to any district that [he] may have applied to in the state" and that "this situation would have thwarted any opportunity . . . to obtain another teaching position . . . ." *Id*. However, plaintiff's

speculation, based on unattributed hearsay, does not suffice to establish that McKenna's statements would have prevented him from obtaining employment in New York State.

Although plaintiff did not apply for positions within New York State, he applied for "several" positions in other states following his departure from HBUFSD. Petrone Aff. at ¶77(2). While he did not receive offers from most of the districts to which he applied, he was not given specific reasons why he did not receive an offer and thus had no reason to believe that the allegedly stigmatizing statements had anything to do with this outcome. *Id.* It is undisputed that plaintiff found employment as a teacher in Gustine, California, in June 2004; had been employed by that District ever since; and was working as both the assistant principal of Gustine High School and the principal of another Gustine school at the time of his January 28, 2010, deposition. *Id*. at ¶¶75, 79-80.

While plaintiff has no evidence that he himself was denied any position because of McKenna statements, plaintiff has adduced opinion testimony from one Gregory Metzger, a teacher in the Southampton School District and a personal friend of plaintiff. Metzger Dep. at 6, 8. At his January 25, 2010, deposition, Metzger offered a detailed description of the hiring process in New York school districts, first stating that "usually the administrator – either the principal and or the superintendent [–] may call some of your references," and then stating that if the applicant "came from a different district, they will call that principal or superintendent." *Id*. at 41. However, Metzger admitted that his understanding of the process was based on his own experiences in the Southampton School District. *Id*. at 19, 40. Metzger testified that he had never been part of the hiring process even at his own high school, other than to provide feedback regarding some demonstration lessons given by applicants. *Id*. at 42. Rather, Metzger claimed

that he learned of the hiring process "[f]rom being a teacher for nine years in a district and seeing lots of teachers come and go." *Id.* at 50. This limited experience did not qualify him as an expert on the hiring practices of all New York school districts.

Plaintiff's reliance on *Donato*, 96 F.3d 623, and *Huntley v. Cmty. Sch. Bd.*, 543 F.2d 979 (2d Cir. 1979), is misplaced. *Donato* held that the publication requirement is "satisfied where the stigmatizing charges are placed in the discharged employee's personnel file and are likely to be disclosed to prospective employers," noting that "[p]otential future employers undoubtedly will consult plaintiff's prior employer when she applies for supervisory positions." 96 F.3d at 631-32. In this case, however, there is no proof that the stigmatizing statements were placed in plaintiff's personnel file. Morever, plaintiff, who was not initially applying for supervisory positions, subsequently succeeded in obtaining a supervisory position in California.

Similarly, in *Huntley*, the serious charges that prompted the discharge of the plaintiff, an acting school principal, were publicly read at a well-attended meeting that turned into "bedlam," causing the police to "rush[] in to break it up." 543 F.2d at 983.[13] The Second Circuit held, "Having discharged Huntley with a public statement of these charges, it is unlikely that Huntley would ever have a chance to obtain another supervisory position in the public schools or elsewhere." *Id.* at 985. The circumstances in *Huntley* are simply not comparable to circumstances in this case.

---

[13]These charges included statements that Huntley "failed to demonstrate that quality of leadership necessary to effectively deal with the educational program"; that he was responsible for the rapid deterioration of the school; that he "had not provided for the basic safety of the children and staff"; and that his "leadership" had "created a climate of confusion and discontent." 543 F.2d at 985.

## IV. Plaintiff's State Law Claims

The last four points raised in Defendants' Memo relate to plaintiff's state law claims. This Court will address only the last of these – Point VII – which argues that this Court should refrain from exercising its pendent jurisdiction if all federal claims are dismissed prior to trial. Defendants' Memo at 25.

A district court "may decline to exercise supplemental jurisdiction over a claim . . . [if] . . . the district court has dismissed all claims over which it has original jurisdiction . . . ." 28 U.S.C. § 1367(c)(3).[14] "The exercise of supplemental jurisdiction is within the sound discretion of the district court." *Lundy v. Catholic Health Sys. of Long Island Inc*., 711 F.3d 106, 117 (2d Cir. 2013). In exercising that discretion, "[c]ourts 'consider and weigh in each case, and at every stage of the litigation, the values of judicial economy, convenience, fairness, and comity in order to decide whether to exercise' supplemental jurisdiction." *Id.* at 117-18 (quoting *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 (1988)).

Usually, when "all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine – judicial economy, convenience, fairness, and comity – will point toward declining to exercise jurisdiction over the remaining state-law claims." *Cohill*, 484 U.S. at 350 n. 7. Thus, the Second Circuit has repeatedly stated that "if a plaintiff's federal claims are dismissed before trial, 'the state claims should be dismissed as

---

[14]"The concept of supplemental jurisdiction, first codified in 28 U.S.C. § 1367 in 1990, has its origins in the judicial doctrine of pendent jurisdiction." *Valencia ex rel. Franco v. Lee*, 316 F.3d 299, 305 (2d Cir. 2003). Accordingly, the terms "pendent jurisdiction" and "supplemental jurisdiction" are used interchangeably. *See id.* (listing instances in which "the district court did not abuse its discretion in exercising supplemental (or pendent) jurisdiction over state-law claims after the plaintiff's federal claims had been dismissed").

well.'"  *Brzak v. United Nations*, 597 F.3d 107, 113-14 (2010) (quoting *Cave v. E. Meadow Union Free Sch. Dist.*, 514 F.3d 240, 250 (2d Cir. 2008)).  To be sure, "[d]ismissal of the pendent state law claims is not . . . 'absolutely mandatory' . . . where the federal claims have been dismissed before trial . . . ."  *Marcus v. AT&T Corp.*, 138 F.3d 46, 57 (2d Cir. 1998).  For example, the Second Circuit has held that a district court did not abuse its discretion by exercising supplemental jurisdiction where the dismissal of the federal claim had occurred just nine days before the scheduled start of trial, *see Nowak v. Ironworkers Local 6 Pension Fund*, 81 F.3d 1182, 1191-92 (2d Cir. 1996), or where, by the time the federal claims were dismissed, discovery had been completed, the court had decided three dispositive motions, and the case was ready for trial, and where the state-law claims involved only settled principles, rather than legal questions that were novel.  *See Raucci v. Town of Rotterdam*, 902 F.2d 1050, 1055 (2d Cir. 1990).  However, "[i]n general, where the federal claims are dismissed before trial, the state claims should be dismissed as well."  *Marcus*, 138 F.3d at 57.

Considering the facts of this case, this Court declines, in the exercise of its discretion, to exercise supplemental jurisdiction in this case.  All federal claims have been dismissed, and no trial has yet been scheduled.  In addition, the issues of whether McKenna's allegedly slanderous comments are actionable under New York law raises substantial questions of state law. Since this Court elects not to retain jurisdiction over the state law claims, this Court need not adjudicate the arguments set forth in Points IV, V and VI of Defendants' Memo.

## CONCLUSION

For the reasons set forth above, defendants' motion for summary judgment is granted with respect to the first seven causes of action alleged in plaintiff's Second Amended Complaint,

which assert claims under the ADA, the Rehabilitation Act and 42 U.S.C. § 1983. This Court declines to exercise supplemental jurisdiction with respect to plaintiff's eighth, ninth, and tenth causes of action, which raise state law claims. The Clerk of Court is directed to enter judgment in accordance with this Memorandum and Order and to close this case.

**SO ORDERED.**


                                     /s/
                                  SANDRA L. TOWNES
                                  United States District Judge

Dated: July 10, 2013
       Brooklyn, New York